USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 94-2092 DONNA SINGER, Plaintiff, Appellee, v. STATE OF MAINE, ET AL., Defendant, Appellee. __________________ JOHN LAFAVER, ET AL., Defendants, Appellants. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Morton A. Brody, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Bownes, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Roy S. McCandless, with whom Charles A. Harvey, Jr., and Verrill _________________ _______________________ _______ & Dana were on brief for appellee State of Maine, Bureau of Taxation, ______ and appellants John LaFaver, David Campbell, Stephen Murray, and Elizabeth Dodge. Joyce A. Oreskovich, with whom Claudia C. Sharon, and Sharon & ____________________ __________________ ________ Oreskovich were on brief for appellee. __________ ____________________ April 13, 1995 ____________________ BOWNES, Senior Circuit Judge. Plaintiff-appellee BOWNES, Senior Circuit Judge. _____________________ and defendants-appellants were employees of the State of Maine Bureau of Taxation ("Bureau") when this suit arose. Defendants were senior management supervisors.1 Plaintiff Donna Singer was a tax examiner in the Collections Unit of the Enforcement Division. Singer was discharged from the Bureau in November 1992, less than a year after she (along with six other Bureau employees) filed both state and federal age and sex discrimination claims against her employers. In February 1994, after having received right-to- sue letters from both the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC"), Singer filed suit in the district court against the Bureau and these defendants in their official and individual capacities. The complaint alleged that defendants violated state and federal law by firing her in retaliation for her having filed the discrimination claims against them. The complaint also alleged, under 42 U.S.C. 1983, that: (i) the process by which Singer was terminated violated her due process rights under the Fourteenth Amendment; and (ii) defendants violated her Fifth Amendment right against  ____________________ 1. Defendant John LaFaver was State Tax Assessor; David Campbell was Director of the Administrative Services Division of the Department of Administrative and Financial Services; Stephen Murray was Director of the Enforcement Division; and Elizabeth Dodge was Acting Director of the Enforcement Division. -2- 2 compelled self-incrimination by firing her after she refused to answer questions asked during an investigation into her conduct as a Bureau employee. In response to defendants' motion for summary judgment on all counts, the district court held first, that Singer's cause of action under 42 U.S.C. 1983 was barred against the Bureau and the individual defendants in their official capacities. Second, the court denied defendants' motion for summary judgment on the retaliation claims. Third, the court held that the individual defendants were entitled to qualified immunity as to the Fourteenth Amendment claim, and granted their motion for summary judgment. Singer does not appeal this ruling. Finally, the court denied defendants' motion for summary judgment with respect to the Fifth Amendment claim, holding that they were not entitled to qualified immunity. The sole issue on appeal is whether defendants are entitled to qualified immunity on the Fifth Amendment claim. We reverse. I. Background I. Background __________ On appeal from a denial of a defendant's motion for summary judgment, the court must view the facts in the light most favorable to the plaintiff. Cotnoir v. University of _______ _____________ Maine Sys., 35 F.3d 6, 8 (1st Cir. 1994) (citing Febus- ___________ ______ Rodr guez v. Betancourt-Lebr n, 14 F.3d 87, 89 (1st Cir. _________ _________________ 1994)). Both cases turned on the issue of qualified immunity. -3- 3 In February 1992, Singer joined six other Bureau employees in filing age and sex discrimination claims, first with the MHRC, and later with the EEOC.2 In a letter dated April 29, 1992, addressed to defendants Campbell and LaFaver, the MHRC requested information relating to the discrimination complaint ("the complaint"), and asked that certain Bureau representatives be present at a fact-finding conference scheduled for June 5, 1992. Over the next several months following the filing of the complaint, the MHRC conducted an investigation of the claims alleged therein.3 During this period, certain incidents occurred which caused Singer to feel that she was being "singled out" for questioning and disciplinary action in retaliation for her involvement with the complaint. The first incident occurred on May 29, 1992, when Singer was questioned by a supervisor, Frank Hiscock,4 apparently for the first time in her twenty-one year career with the Bureau, about a pattern of tardiness. Singer explained that unforeseeable tardiness was an unavoidable  ____________________ 2. Prior to February 1992, Singer had never filed a union grievance; she had, however, filed a previous complaint with the MHRC, when she was "passed over" for the job of tax examiner in the early 1980's. 3. The EEOC held its own investigation in abeyance pending the outcome of the MHRC investigation. 4. Hiscock is not a party to this litigation, but was among those whose presence was requested at the MHRC fact-finding conference. -4- 4 consequence of a disability from which she had suffered for fifteen years prior to this incident. According to the defendants, the Bureau had no previous knowledge or record of Singer's disability and the decision to question her about her tardiness was in no way connected to her involvement with the complaint. For her part, Singer maintains that her tardiness had never before been an issue; that, prior to the filing of the complaint, her tardiness had been neither documented nor questioned by any supervisor; and that, when she was tardy, she always made up the time at the end of the day. In response to the supervisor's request, Singer arranged with her attorney and doctor to provide the Bureau with documentation of her medical condition. The attorney informed defendant LaFaver of Singer's disability soon after the May incident, and the doctor prepared the statement in early June. By error, however, the doctor's statement was not sent to the Bureau at that time. On October 16, 1992, Singer was again confronted with the issue of tardiness by a new supervisor, Mark Hathaway,5 a former co-worker, who stated that he was unaware of her disability and that there was no doctor's confirmation of her condition on file with the Bureau.  ____________________ 5. Like Hiscock, Hathaway is not a party to this suit, but his attendance at the MHRC fact-finding conference was also requested. -5- 5 Singer's attorney subsequently enclosed the doctor's statement with a letter to defendant Murray, dated October 21, 1992. Singer's belief that she had been targeted for discipline because of her involvement in the complaint was buttressed by her discovery that, some time after the complaint was filed, defendant Campbell, in a memorandum to Sawin Millet, Commissioner of the State of Maine Department of Administrative and Financial Services, had referred to Singer as one of the "troublemakers" at the Bureau. In late August 1992, an incident ("the TRACE incident") occurred, which prompted the Bureau to investigate Singer's conduct as a Bureau employee. To understand the TRACE incident, it is necessary to know more about Singer's job. A tax examiner in the Collections Unit monitors delinquent taxpayer accounts and contacts these taxpayers in an effort to collect the taxes owed. Each examiner services many hundreds of accounts. Information relating to each account, along with information regarding contacts made and actions taken by the examiner, are recorded in a computerized system known as TRACE. The examiner's first step in the collection process is to attempt to make personal contact with the taxpayer, by telephone or in writing. In the event the examiner is unsuccessful in her attempts to collect the taxes, the next step is to issue a levy demand against the -6- 6 taxpayer, which notifies the taxpayer that the debt must be paid within ten days, and outlines the actions to be taken if payment is not received within that time. These actions include, but are not limited to, involuntary wage levies, liens, seizure of property, and public disclosure of the debt in court. If the debt is not paid in response to the levy demand, the state is allowed to take possession of the taxpayer's assets in lieu of payment. By law and Bureau policy, employees are required to maintain the confidentiality of all taxpayer records. Bureau policy requires that each employee sign a statement acknowledging both the responsibility to maintain confidentiality and that the unauthorized disclosure of tax information could result in immediate dismissal and the imposition of penalties under state and federal law. Singer signed confidentiality statements in 1985 and 1987. The TRACE incident began when a Bureau supervisor received an anonymous telephone call from a woman who accused a Bureau clerk of discussing her tax account outside the Bureau. The accusation was apparently unfounded. The clerk had recently experienced a number of problems with a woman who had become involved with her estranged husband. She suspected that the anonymous caller was the same woman and that the call had been made in order to cause the clerk trouble with the Bureau. Having identified the woman as a -7- 7 delinquent taxpayer whose active account had been assigned to Singer, the clerk and another employee talked to Singer about the situation. Singer herself had no personal relationship with the suspected caller and did not know her. Singer gathered from the conversation that the clerk was very upset because she thought that she might be fired as a consequence of the anonymous call. Singer looked up the name of the woman in the TRACE system and noted the status of the account. Singer's conversation with the clerk later resumed. When, in the course of relating another incident involving the suspected caller, the clerk mentioned the city in which the woman lived, Singer realized that this information did not comport with the address listed for that account in the TRACE system, the address at which Singer tried unsuccessfully to contact the woman a year ago, when she had last worked on the account. Singer then asked for and received from the clerk the correct address and telephone number for the woman. When Singer returned to her work station, she again called up the woman's account on the TRACE system, and recorded the following message: "[The woman] called in to try to get [the clerk] in trouble. The complaint was unfounded and that of a personal nature between them." Singer argues that it was not at all unusual to record such a message and that she did so simply to notify other employees who might -8- 8 have dealings with the account that the woman might cause problems. In the course of recording the message, Singer noticed a "CP code" on the system that alerted her to the fact that the taxpayer was listed on another part of the system as owing additional taxes. According to Singer, it was part of her job as an examiner to consolidate these accounts and inform the taxpayer of the total amount owed. In order to do that, it was necessary to enter into the system a request for a levy demand. According to Singer, under these circumstances, in which the examiner has previously tried and failed to establish contact with the taxpayer, and must now notify the taxpayer of the total amount of the consolidated debt, a levy demand is the only means of notification available to the examiner. Accordingly, in addition to updating the address and phone number, Singer entered the following TRACE message: "Going to have [the accountant] send a Levy Demand on all because they also owe for a CP under 1983." The clerk somehow learned of the TRACE message, was upset by it, and reported it to her supervisor, Brian Mahany. When Singer learned that the clerk was upset about the message, she asked to speak with Mahany about it in order to explain to him what she had done and why. Although Singer believed she had done nothing unusual or inappropriate, -9- 9 Mahany made it clear that he thought otherwise. After asking her to remove the message, which was impossible because the messages entered are permanent, Mahany instructed Singer to add the following message: "If this lady should call with any complaint, give call to a supervisor." He then took action to freeze the levy demand and reported the matter to defendants Dodge and Murray. The Bureau's position is that Singer's conduct in this regard was subject to investigation and possible discipline because Singer: (i) removed the account from its predetermined position in the TRACE system's chronological order of priority without first attempting personal contact with the taxpayer; (ii) entered a personal message on the TRACE system and took official action against a taxpayer for personal reasons; and (iii) issued the levy demand out of the normal sequence in which such action would have been taken in the ordinary course of Bureau business. Singer's position is that the Bureau's response to the TRACE incident is another indication that she had been targeted for discipline because of her participation in the MHRC complaint. She argues that her conduct was not inappropriate because neither the message nor the actions she took were personal, unusual, or extreme. Furthermore, affidavits sworn by co-workers indicate that: (i) such messages were frequently entered into the system, sometimes by supervisors; (ii) at the time of the TRACE incident, there -10- 10 were no written rules governing such messages; and (iii) at the time of the incident, the decision when to issue a levy demand was discretionary with the tax examiner. On August 27, 1992, Singer was called to a meeting with defendant Dodge and Supervisor Mahany, at which Dodge questioned her about the TRACE incident. Dodge took the position that Singer's actions were related to the personal life of a Bureau employee, rather than to official Bureau business, and therefore were inappropriate. Singer explained that the message was neither personal nor unusual, and that her decision to issue the levy demand had nothing to do with the clerk's problems with the caller. Unsatisfied with Singer's explanation for her conduct, Dodge informed Singer that the investigation would continue. According to Singer, Dodge also asked Singer to provide her with examples of similar messages that had been entered into the TRACE system. A meeting to investigate the matter further was scheduled for October 2, 1992. On September 30, 1992, Singer's attorney called defendant Dodge to request permission to attend the meeting. Singer wanted her attorney present because she felt certain that she was being singled out for disciplinary action in retaliation for the MHRC complaint. The request was granted, but the attorney was unable to attend the meeting for other reasons. Present at the meeting for the Bureau were Supervisor Hathaway, -11- 11 Personnel Manager Pat Beaudoin, and defendants Murray and Dodge. Singer was present, represented by Roger Parlin of the Maine State Employees Association ("MSEA"). Parlin is not an attorney. At the outset of the meeting, Dodge announced that its purpose was to discuss an incident related to Singer's work. She then questioned Singer about the TRACE incident and Singer answered all the questions put to her. Although the record is not clear as to exactly what happened at the conclusion of the questioning, it does establish the following: (i) Parlin tried to ascertain whether it was the Bureau's position that Singer had broken the law; (ii) although Murray stated that the meeting was a fact-finding session and not a criminal investigation, both Singer and Parlin believed there to be a threat of criminal charges; (iii) Parlin had in his possession copies of TRACE screen printouts, which had been redacted so as to exclude confidential taxpayer information, and which contained messages similar to the one for which Singer was under investigation that had been entered into the system by other Bureau employees;6 (iv) at some point, the defendants became  ____________________ 6. The record also indicates that, in the course of her questioning of Singer, Dodge herself displayed a similarly redacted printout of the TRACE screen at issue in the investigation, in full view of Parlin. -12- 12 aware that Parlin had these documents in his possession; and (v) Parlin, followed by Singer, left the meeting abruptly. Concerned that Singer had disclosed confidential taxpayer records to union representatives without authorization, in violation of law and Bureau policy, defendants Murray and LaFaver attempted to recover from Parlin and the MSEA any confidential Bureau records in their possession. In one such attempt, a letter to the MSEA Chief Counsel dated October 14, 1992, LaFaver stated that he had reviewed the matter with the State Attorney General, who shared his view that "this situation appears to involve an extremely serious breach of taxpayer confidentiality." The MSEA maintained throughout that it did not have any confidential taxpayer information. Meanwhile, in letters to defendants Murray and Dodge, dated October 21 and October 27, 1992, respectively, Singer's attorney stated that she understood Singer to have been threatened with criminal charges at the October 2 meeting, and asked to be advised of the nature and status of those charges. In both letters, the attorney made it clear that Singer would not be allowed to meet with anyone concerning criminal charges without benefit of counsel. In the letter of October 27, the attorney also said that, in order to advise her client, she needed to know the questions that would be asked at the next investigatory meeting. The -13- 13 Bureau did not respond to these requests for clarification regarding the threat of possible criminal charges perceived by Singer and her representatives. The Bureau scheduled another meeting for November 10, 1992, in order to ask additional questions. The Bureau was represented at this meeting by the same people who attended the October 2 meeting: Supervisor Hathaway, Personnel Manager Beaudoin, and defendants Murray and Dodge. Singer was present, represented by Robert McLaughlin, a different MSEA representative, who is not an attorney. Singer's attorney was present, but was not allowed to participate. At the outset of this meeting, prior to any questioning, McLaughlin asked to know the purpose of the meeting, whether it was a criminal investigation, and whether he could tape the meeting. Defendant Dodge replied that the meeting pertained only to alleged work-related misconduct, that it was not a criminal investigation, that no one at the Bureau was empowered to conduct a criminal investigation, and that the meeting could not be taped. Before proceeding with the questioning, defendant Dodge told Singer that it would be to her advantage to answer the questions. Singer was neither advised of, nor was she asked to waive, her Fifth Amendment privilege against self- incrimination. She was not told that there would or would not be a criminal investigation in the future; nor was she -14- 14 informed whether the answers she gave at this meeting could be used against her in a subsequent criminal proceeding, or that she would be fired if she refused to answer the questions put to her at this meeting. The first two questions asked whether Singer had provided Parlin with TRACE screen printouts or other Bureau documents. When Singer did not answer these questions pursuant to the whispered instructions of her attorney, McLaughlin was reminded that the attorney was not allowed to participate in the meeting. Singer's attorney thereupon requested and received a copy of the five questions to be asked, and met outside privately with Singer and McLaughlin. When the investigatory meeting reconvened, McLaughlin announced that he would not allow Singer to answer questions one through four (which asked whether Singer had disclosed to Parlin or to anyone else TRACE screen printouts or other Bureau documents) because they were not job related. After repeating her previous admonition that it would be to Singer's advantage to answer, defendant Dodge asked the five questions. The record indicates that McLaughlin would not allow Singer to answer questions one through four. There is no indication that Singer verbally invoked her Fifth Amendment privilege at any time during the meeting. In answer to the last question (whether Singer agreed with the MSEA Chief Counsel that Murray had given a TRACE screen -15- 15 printout to Parlin at the October 2 meeting) Singer replied that defendant Dodge, rather than defendant Murray, had done so. Before the meeting adjourned, McLaughlin stated that the MSEA had nothing confidential in its possession. On November 16 and 17, 1992, McLaughlin spoke by telephone with Personnel Manager Beaudoin. McLaughlin stated that Singer's attorney had reviewed the criminal statutes and determined that admissions made by Singer could subsequently be used against her. He added that Singer would answer questions presented in writing if they were related to the original incident, but that the questions asked at the November 10 meeting would not be answered. On November 19, 1992, defendant LaFaver delivered to Singer a letter informing her that the investigators had concluded as follows: (i) Singer had ordered the levy demand for personal reasons, an inappropriate activity constituting misconduct;7 (ii) she had given confidential documents to a person not entitled to possess them, an inappropriate activity constituting gross misconduct;8 (iii) Singer refused both to acknowledge this misconduct and to give any reassurances that it would not be repeated; and (iv) the  ____________________ 7. According to the Bureau's report of the investigation, a document separate and apart from LaFaver's letter, this conduct constitutes grounds for disciplinary action. 8. According to the Bureau's report, this conduct constitutes grounds for dismissal. -16- 16 Bureau could no longer trust Singer with confidential Bureau records. As a result, Singer was immediately placed on administrative leave, and dismissed from the Bureau on November 24, 1992. Although the letter also informed Singer that she had a right to meet with LaFaver on November 23, 1992, to discuss her dismissal, Singer did not do so. As has been stated, Singer and six other Bureau employees had filed discrimination complaints with the MHRC and the EEOC in February 1992. In November 1993, Singer received right-to-sue letters from both agencies. On February 8, 1994, she filed in the district court the suit giving rise to this appeal. We now turn to the only issue before us on appeal, the question whether the individual defendants are entitled to qualified immunity as to the 1983 Fifth Amendment claim. II. Standard of Review II. Standard of Review __________________ To the extent a district court order denying a claim of qualified immunity turns on an issue of law, it is an appealable final decision within the meaning of 28 U.S.C. 1291. Mitchell v. Forsyth, 472 U.S. 511, 530 (1985); ________ _______ Cotnoir v. University of Maine Sys., 35 F.3d at 9.  ___________________________________ Where a qualified immunity defense is asserted by pre-trial motion, the usual summary judgment standards apply. Amsden v. Moran, 904 F.2d 748, 752 (1st Cir. 1990), cert. ______ _____ _____ -17- 17 denied, 498 U.S. 1041 (1991). Accordingly, summary judgment ______ is proper only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). III. Discussion III. Discussion __________ A. Qualified Immunity A. Qualified Immunity __________________ 1. 1. __ It is undisputed that Singer was discharged from the Bureau, in part, for her refusal to answer the questions asked of her at the November 10 meeting. Defendants make two arguments on appeal. First, they argue that their actions did not violate Singer's Fifth Amendment rights according to established precedent at the time of these events. Second, they argue that there was no clearly-established right of a public employee to refuse to answer employment-related questions where: (i) the employer did not seek a waiver of the employee's Fifth Amendment right against self- incrimination; (ii) the employee did not actually claim the Fifth Amendment privilege; and (iii) the employee's answers were never used against her in a subsequent criminal prosecution. -18- 18 Qualified immunity shields public officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, ______ __________ 457 U.S. 800, 818 (1982). The right alleged to have been violated must have been clearly established at the time of the alleged violation, id., and "[t]he contours of the right ___ must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). ________ _________ The qualified immunity analysis focuses on the objective reasonableness of the defendant's actions. "[T]he relevant question is whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct." Febus- ______ Rodr guez, 14 F.3d at 91 (quoting McBride v. Taylor, 924 F.2d _________ _______ ______ 386, 389 (1st Cir. 1991)) (other citation omitted). In Mitchell v. Forsyth, 472 U.S. 511, 526 (1985), the Supreme ________ _______ Court characterized the qualified immunity defense as an entitlement to "immunity from suit rather than a mere defense __________________ to liability . . . . " In applying these principles to a recent qualified immunity determination, the Supreme Court stated: "A -19- 19 necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is `clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." Siegert v. _______ Gilley, 500 U.S. 226, 232 (1991). We subsequently cited ______ Siegert for the proposition that "before even reaching _______ qualified immunity, a court of appeals must ascertain whether the appellants have asserted a violation of a constitutional right at all." Watterson v. Page, 987 F.2d 1, 7 (1st Cir. _________ ____ 1993). Thus, as a predicate to the objective reasonableness inquiry, "a plaintiff must establish that a particular defendant violated the plaintiff's federally protected rights." Febus-Rodr guez, 14 F.3d at 91 (citations omitted). _______________ Applying these principles, the threshold question in our qualified immunity analysis is whether Singer has established that defendants violated her Fifth Amendment right against self-incrimination. There is no indication in the record that Singer at any time actually stated that she was refusing to answer questions on Fifth Amendment grounds. Instead, she simply remained silent on the advice of her attorney and union representative.9 Under these  ____________________ 9. Moreover, at oral argument, Singer stated that she was not coerced at the November 10 meeting. -20- 20 circumstances, it would appear that there is a real question as to whether Singer actually asserted a Fifth Amendment violation. In her brief, Singer states that "a constitutional violation occurs when an employee is penalized for remaining silent." Appellee's Brief at 21. In their brief, defendants state that Singer did not invoke the Fifth Amendment at the November 10 meeting, but instead refused to respond to the questions asked because they were not job related. Appellants' Brief at 25. These brief references notwithstanding, the parties have not argued before this court the question whether the Fifth Amendment requires that one who seeks to invoke its protection must explicitly claim the privilege, as distinct from simply exercising it by remaining silent in the face of potentially incriminating questions. Under the circumstances, we will assume, without deciding, that Singer invoked the privilege against self- incrimination. 2. 2. __ As recently explained by retired Supreme Court Justice Powell, the inquiry whether the right at issue was clearly established properly focuses "not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." Wiley _____ v. Doory, 14 F.3d 993, 995 (4th Cir. 1994) (quoting Pritchett _____ _________ -21- 21 v. Alford, 973 F.2d 307, 312 (4th Cir. 1992)). "Moreover, ______ `the manner in which this [clearly established] right applies to the actions of the official must also be apparent.'" Id. ___ (quoting Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. ___________ ______ 1992)) (citations omitted) (alteration in original). "[I]f there is a `legitimate question' as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity." Id. (quoting Tarantino ___ _________ v. Baker, 825 F.2d 772, 775 (4th Cir. 1987)).  _____ We think that this perspective gives a clear view of the qualified immunity issue. B. The Fifth Amendment Rights of Public Employees B. The Fifth Amendment Rights of Public Employees ______________________________________________ The Fifth Amendment states that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. The Supreme Court has addressed the Fifth Amendment rights of public employees in the Garrity line of cases. See Garrity v. New Jersey, 385 _______ ___ _______ __________ U.S. 493 (1967); Gardner v. Broderick, 392 U.S. 273 (1968); _______ _________ Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation, ______________________________ __________________________ 392 U.S. 280 (1968). See also Lefkowitz v. Turley, 414 U.S. ___ ____ _________ ______ 70 (1973); Lefkowitz v. Cunningham, 431 U.S. 801 (1977). _________ __________ In Garrity, police officers were compelled under _______ the threat of termination to answer incriminating questions in the course of an investigation into traffic-ticket -22- 22 "fixing." Prior to questioning, each officer was warned, in accordance with a state statute, as follows: (1) that anything he said might be used against him in any state criminal proceeding; (2) that he had the privilege to refuse to answer if the disclosure would tend to incriminate him; but (3) that if he refused to answer he would be subject to removal from office. Garrity, 385 U.S. at 494. _______ The officers were not asked to sign a waiver of immunity and there was no immunity statute applicable under the circumstances. The officers answered the questions and some of these answers were used against them in a later criminal proceeding. The Court concluded that the officers had been forced to choose between losing their jobs and incriminating themselves, and held that their coerced statements, "obtained under threat of removal from office," could not be used against them in subsequent criminal proceedings. Id. at 500. ___ Gardner and Uniformed Sanitation Men both involve _______ ________________________ public employees (in Gardner, a police officer; in Uniformed _______ _________ Sanitation Men, municipal sanitation workers) who were _______________ unconstitutionally "confronted with Hobson's choice between self-incrimination and forfeiting [their] means of livelihood . . . . " Gardner, 392 U.S. at 277; see also Uniformed _______ ___ ____ _________ Sanitation Men, 392 U.S. at 284. In Gardner, a police _______________ _______ officer, who was subpoenaed to appear before a grand jury -23- 23 investigating alleged bribery and corruption of police officers, was advised as follows: (i) that the grand jury intended to ask him questions concerning the performance of his official duties; (ii) that he had a constitutional privilege against self-incrimination; and (iii) that by law he was required to sign a waiver of immunity or else be fired. After he refused to testify and to sign the waiver, the officer was given an administrative hearing and discharged pursuant to a provision of the New York City Charter, solely for his refusal to waive his Fifth Amendment rights. Gardner, 392 U.S. at 274-75. Noting that the _______ officer "was discharged from office, not for failure to answer relevant questions about his official duties, but for . . . failure to relinquish the protections of the privilege against self-incrimination," id. at 278, the Court held ___ unconstitutional both the officer's dismissal for his refusal to waive his immunity and the Charter provision that authorized it. Significantly, the Court in Gardner and in _______ Uniformed Sanitation Men preserved the right of a public _________________________ employer to ask job-related questions of the employee: If appellant, a policeman, had refused to answer questions specifically, directly, and narrowly relating to the performance of his official duties, without being required to waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself, the privilege against self- -24- 24 incrimination would not have been a bar to his dismissal. Gardner, 392 U.S. at 278 (citation omitted); see also _______ ___ ____ Uniformed Sanitation Men, 392 U.S. at 284. ________________________ Justice Powell concludes that the "language in these cases suggests that the right against self- incrimination is not violated by the mere compulsion of statements, without a compelled waiver of the Fifth Amendment privilege or the use of compelled statements against the maker in a criminal proceeding." Wiley v. Doory, 14 F.3d at _____ _____ 996 (citation omitted); see also Wiley v. Mayor of Baltimore, ___ ____ _____ __________________ --- F.3d ---, 1995 WL 85433, 3 (4th Cir. 1995); accord Hester ______ ______ v. City of Milledgeville, 777 F.2d 1492, 1494 (11th Cir. _______________________ 1985); Gulden v. McCorkle, 680 F.2d 1070, 1074 (5th Cir. ______ ________ 1982), cert. denied, 459 U.S. 1206 (1983); Uniformed _____ ______ _________ Sanitation Men Ass'n v. Commissioner of Sanitation, 426 F.2d ____________________ __________________________ 619, 627 (2nd Cir. 1970), cert. denied, 406 U.S. 961 (1972). _____ ______ In United States v. Indorato, 628 F.2d 711, 716 _____________ ________ (1st Cir.), cert. denied, 449 U.S. 1016 (1980), this court _____ ______ summarized the Garrity line of cases in similar fashion, _______ noting the two features common to Garrity and its progeny:  _______ (1) the person being investigated is explicitly told that failure to waive his constitutional right against self- incrimination will result in his discharge from public employment (or a similarly severe sanction imposed in the case of private citizens); and (2) there is a statute or municipal ordinance mandating such procedure. -25- 25 (Footnote omitted). In Indorato, appellant, a state trooper who had ________ been convicted of conspiracy, theft and perjury, contended on appeal that his statements in response to questions asked by his superior officers during an investigation of the events which gave rise to the charges were coerced, and therefore inadmissible against him at trial under the Fifth Amendment. Indorato, who was not in custody at the time he made the statements, was not advised of his rights prior to questioning and was not threatened with dismissal for refusal to answer the questions asked of him. Relying on Garrity, Indorato argued that the threat _______ of dismissal was nevertheless implied because he was being questioned by superior officers and was well aware that the departmental rules governing the state police provided for the dismissal of officers who refused to obey the lawful orders of superior officers. Under these circumstances, Indorato viewed himself as having been put in the same position as the officers in Garrity. _______ In rejecting Indorato's argument, we stated: "In this case, there was no explicit `or else' choice and no statutorily mandated firing is involved. We do not think that the subjective fears of defendant as to what might happen if he refused to answer his superior officers are sufficient to bring him within Garrity's cloak of _________ -26- 26 protection." Indorato, 628 F.2d at 716. In holding that ________ there was no Fifth Amendment violation on these facts, we said: Here, defendant did not claim the privilege. He was not told that he would be dismissed if he failed to answer the questions asked. He was not asked to sign a waiver of immunity. There was no statute mandating dismissal for refusal to answer hanging over his head. Defendant, here, was not, as in Garrity, _______ put between the rock and the whirlpool; he was standing safely on the bank of the stream. Id. at 717 (citation and internal quotation marks omitted).  ___ Singer, like Indorato, did not explicitly claim the privilege; was not told that she would be dismissed if she failed to answer the questions asked of her; was not asked to sign a waiver of immunity; and had no statute mandating dismissal for refusal to answer hanging over her head.10 Accordingly, Singer was not put "between the rock and the  ____________________ 10. In Indorato, we said that the language used in the state ________ police departmental rules, which provided that a trooper may ___ be tried and upon conviction may be subject to dismissal or ___ other disciplinary action for violation of the rules, "suggests that dismissal would not have automatically followed defendant's invocation of the [F]ifth [A]mendment." Indorato, 628 F.2d at 716.  ________ As stated in the text, here, there is no statute mandating dismissal for refusal to answer questions. Moreover, the language used in the Bureau's confidentiality statement suggests that dismissal would not automatically follow an employee's invocation of the Fifth Amendment: "Unauthorized disclosure of any tax information may result in ___ immediate dismissal and imposition of penalties prescribed by Maine and Federal statutes." Appendix p. 00080 (emphasis added). -27- 27 whirlpool," as were the plaintiffs in the Garrity line of _______ cases. Instead, like Indorato, she was "standing safely on the bank of the stream." Therefore, we must agree with defendants that their actions did not amount to a violation of a clearly- established Fifth Amendment right under Supreme Court and First Circuit precedent at the time of these events. See ___ also In re Grand Jury Proceedings, 835 F.2d 375, 376 (1st ____ ______________________________ Cir. 1987) (the Fifth Amendment "does not shield a person from every adverse social or economic consequence which may flow from testifying," and is not violated where a public employee who has been granted immunity is required to testify before a grand jury investigating illegal activities) (citation omitted); O'Brien v. DiGrazia, 544 F.2d 543, 546 _______ ________ (1st Cir. 1976) (Fifth Amendment rights of police officers dismissed for refusing to complete a required financial questionnaire as part of an investigation into their alleged relationship with organized crime were not violated because the "privilege is not infringed when public employees are dismissed for failing to answer questions `specifically, directly, and narrowly relating to the performance of their official duties . . . . '" (quoting Uniformed Sanitation _____________________ Men, 392 U.S. at 284) (other citation omitted)), cert. denied ___ _____ ______ sub nom. O'Brien v. Jordan, 431 U.S. 914 (1977); accord ___ ____ _______ ______ ______ Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation, ______________________________ __________________________ -28- 28 426 F.2d at 627 ("The proceeding here involved no attempt to coerce relinquishment of constitutional rights, because public employees do not have an absolute constitutional right to refuse to account for their official actions and still keep their jobs . . . ."). In view of the divergence of opinion among the circuits with respect to the various issues that circumscribe the Fifth Amendment rights of public employees, we agree with the defendants that the law in this area was unsettled at the time of these events and remains so today.11 When viewed at the level of their application to the specific conduct being challenged here, neither the contours of the Fifth Amendment right itself, nor the manner in which that right applies to the actions of these defendants are at all apparent. Thus, whatever else may be said of the law governing the Fifth Amendment rights of public employees in these circumstances, it cannot be maintained that it was then or is now clearly established. We cannot conclude that defendants knew or should have known that their actions violated Singer's clearly-  ____________________ 11. See Justice Powell's review of the federal law in this ___ area in Wiley v. Doory, 14 F.3d at 998 ("Today, approximately _____ _____ six years after Doory's alleged conduct, the law remains unsettled."); and in Wiley v. Mayor of Baltimore, 1995 WL _____ ___________________ 85433 at 4 ("We recognize that, in cases involving private citizens, there is some inconsistency in the circuits regarding whether or not a Fifth Amendment violation can occur when the fruits of coerced questioning are not used."). -29- 29 established Fifth Amendment rights. Indeed, it could be reasonably argued that under the applicable law, there was no Fifth Amendment violation at all. Accordingly, we hold that defendants are entitled to qualified immunity as to the 1983 Fifth Amendment claim. IV. Conclusion  IV. Conclusion __________ For the foregoing reasons, the district court's the district court's _____________________ order denying summary judgment to defendants on the Fifth order denying summary judgment to defendants on the Fifth _____________________________________________________________ Amendment claim is reversed. No Costs. Amendment claim is reversed. No Costs. ___________________________ ________ -30- 30