John DOE, By and Through his mother and next friend, Mrs. DOE and Mrs. Doe, Mother of John Doe, Plaintiffs,

v.

The MASSACHUSETTS DEPARTMENT FOR SOCIAL SERVICES and Beth Tetreault, Defendants.

C.A. No. 95–11265–RCL.

United States District Court, D. Massachusetts.

Nov. 8, 1996.

David W. Zizik, Zizik, LaSalle & Powers, P.C., Wellesley, MA and Timothy J. Conlon, Providence, RI, for Plaintiffs.

Beverly R. Roby, Attorney General's Office, Boston, MA, for Defendants.

LINDSAY, District Judge.

Report and recommendation *accepted.* Judgment of dismissal shall enter.

### REPORT AND RECOMMENDATION RE-GARDING DEFENDANTS' MOTION TO DISMISS (DOCKET NO. 16)

Filed **October 18, 1996**

KAROL, United States Magistrate Judge.

### I. INTRODUCTION

On June 15, 1995, the Department of Social Services of the Commonwealth of Massachusetts ("DSS") had legal and physical custody of a minor who, for purposes of this lawsuit, shall be known as John. On that date, John's mother and purported "next friend," identified in the complaint as "Mrs. Doe," filed this civil rights action, pursuant to 42 U.S.C. § 1983, on John's behalf against DSS and Beth Tetreault ("Tetreault"), a DSS social worker, who had overall responsibility for John's care.[1] The complaint seeks injunctive relief against DSS and Tetreault and damages against Tetreault personally, for alleged unconstitutional interference by them with John's attempt to prosecute an unrelated lawsuit in Rhode Island state court charging various agencies and officials there with permitting John to be subjected to sexual abuse while he was in the custody of Rhode Island's counterpart of DSS some five years earlier. The specific act of alleged interference consisted of Tetreault's insistence that John's therapist and a DSS social worker be present while John's attorney in the Rhode Island lawsuit (the same attorney who purports to represent John here) interviewed John regarding instances of sexual abuse that had allegedly occurred in Rhode Island.

On June 16, 1995—just one day after this lawsuit was commenced—a Massachusetts judge dismissed the Massachusetts care and protection case pursuant to which DSS had acquired custody. Within days of that decision, DSS returned John to his mother's custody, and John was able to and did meet with his attorney without any restrictions. Some months later, John moved back to Rhode Island to live with his aunt, where he continues to have unrestricted access to his attorney. In fact, as far as the record reveals, Massachusetts has ceased to play any role in John's upbringing.

DSS and Tetreault seek dismissal of the lawsuit on the ground of mootness, to the extent it seeks equitable relief, and on the ground that it is barred by the doctrine of qualified immunity, to the extent it seeks damages from Tetreault. For reasons stated below, I recommend that the motion be **ALLOWED**.[2]

### II. DISCUSSION

#### A. Facts

In or about 1990, John was committed to the care and custody of the State of Rhode Island, Department for Children, Youth & Their Families. At that time, he was placed by Rhode Island authorities in a private facility allegedly owned and operated by the Diocese of Rhode Island under contract with the state. In 1993, apparently after John had returned to his mother's custody, John, through his mother, retained attorney Timothy J. Conlon ("Attorney Conlon") to bring a lawsuit in Rhode Island state court alleging, among other things, that John had been sexually abused while at the facility and that, pursuant to 42 U.S.C. § 1983, Rhode Island state officials were legally responsible for John's injuries.

---

**1.** The complaint also asserted claims on Mrs. Doe's own behalf, but plaintiffs expressly waived those claims in their pretrial memorandum. (Pls.' Pretrial Mem. ¶ 3, Docket no. 13.) Additional unknown DSS employees were also named as defendants, but the analysis that applies to Tetreault applies to them as well.

**2.** Although the pending motion is styled a "motion to dismiss," both parties in their pleadings and at oral argument freely referred to facts established in the record, which record includes filings made in connection with a prior motion by plaintiffs for preliminary injunctive relief. It quickly became apparent at oral argument on the pending "motion to dismiss" that no material facts are in genuine dispute. Accordingly, my recommendation will take those undisputed facts into account, without prejudice to plaintiffs' right to seek reconsideration if plaintiffs believe that the operative facts are materially different from the way I have stated them.

By November 1994, John, who had alleged in his Rhode Island state court complaint that he was a citizen of the State of Rhode Island, had apparently returned to Massachusetts. At that time, for reasons not disclosed in the record, DSS filed a petition pursuant to M.G.L. ch. 119, § 24 in the New Bedford Division of the Juvenile Department seeking to have John adjudged as being in need of care and protection.[3] On November 9, 1994, the juvenile court continued the petition for further hearing and issued a temporary mittimus placing John in DSS custody pending such hearing. DSS placed John in St. Vincent's Home, a residential facility in Fall River, Massachusetts. He remained there, in DSS custody, through the date on which the events that led to the filing of this lawsuit occurred. Tetreault, a DSS social worker, was assigned overall case management responsibility for John.

In April 1995, Attorney Conlon's legal assistant made arrangements through Debbie Olivera, John's case worker at St. Vincent's Home and one of Tetreault's subordinates, to obtain DSS authorization to release John's treatment records to Attorney Conlon, so that he might use them in connection with the pending Rhode Island litigation. Tetreault cooperated by signing a release prepared by Attorney Conlon's office on May 1, 1995. The legal assistant and Ms. Olivera also made arrangements for Attorney Conlon to meet with John at St. Vincent's on May 3, 1995, so that Attorney Conlon could obtain information he needed to respond to long outstanding interrogatories in the Rhode Island matter. There is no indication in the record that, at the time the meeting was scheduled, the legal assistant and Ms. Olivera discussed whether anyone else might be present at the meeting between John and Attorney Conlon.

On the morning of May 3, Ms. Olivera called the legal assistant to request that the meeting be postponed for two hours because Tetreault, who apparently had assumed she would be attending the meeting, had a scheduling conflict. This was the first time that anyone in Attorney Conlon's office realized that Tetreault did not intend to permit Attorney Conlon to meet privately with John. Later that morning, Attorney Conlon, who had attempted unsuccessfully to reach Tetreault by telephone, drove from his office to St. Vincent's for the meeting as originally scheduled. When he arrived, he told Tetreault that his interview with John had to be in private, in order to preserve the attorney-client privilege. Tetreault nevertheless insisted that Ms. Olivera and John's therapist, Tyrone Stallworth, attend the interview. A brief, non-substantive meeting ensued with those individuals in attendance. At the meeting, John purported to authorize Attorney Conlon to bring the present lawsuit. (Conlon Aff. ¶ 9, Docket no. 3.) Immediately after the meeting, Stallworth allegedly told Attorney Conlon that, in Stallworth's professional opinion, it was unnecessary from a

---

**3.** Defendants, in their Motion to Dismiss, erroneously state that John was committed to DSS custody pursuant to M.G.L. c. 119, § 39G. *Compare* Def.'s Mot. Dismiss at 2, Docket 16 (stating that "[t]he Department obtained custody of John pursuant to G.L. c. 119 § 39G") *with* Tetreault Aff. ¶ 9, attached to Def.'s Mem.Opp.Pl.'s Mot.Prelim.Inj., Docket no. 7 (stating that "[i]n November 1994, the Department filed a care and protection petition in the Juvenile Court alleging that John . . . was in need of care and protection"); Nov. 9, 1994 Juvenile Court Order, Tetreault Aff., Ex. A (ordering John to be committed to DSS custody after finding John was "in need of care and protection").

Section 39G deals with children in need of services, or CHINS, defined in M.G.L. ch. 119, § 21 as any child "who persistently runs away from the home . . ., or persistently refuses to obey the lawful and reasonable commands of his parents or legal guardian. . ., or . . . who persistently and wilfully fails to attend school or persistently violates the lawful and reasonable regulations of his school." The distinction between Sections 24 and 39G is significant. Section 24, dealing with whether a child is in need of care and protection, focuses on parents or guardians and their perceived inadequacies, while Section 39G, the CHINS statute, focuses on the child, and his or her alleged misconduct (short of delinquency, which is the subject of M.G.L. ch. 119, § 52, *et seq.*). While the two may be related in a particular case, it seems clear that adjudging a child as being in need of care and protection carries far less stigma and condemnation from the child's perspective than adjudging him or her as being a CHINS. There can be no doubt, based on Tetreault's Affidavit and Exhibits A and B thereto, that the petition in John's case sought to adjudge him as being the former, not the latter.

therapeutic standpoint that he, Stallworth, attend the meeting. (*Id.* ¶ 10.)

Attorney Conlon, who was under great pressure from the court in Rhode Island to respond to the outstanding interrogatories, commenced this lawsuit on June 15, 1995.[4] On June 16, 1995, apparently by coincidence, the Massachusetts Juvenile Court judge dismissed the pending care and protection petition. Within a few days, John returned to his mother's custody and he was able to meet privately with Attorney Conlon without incident. There have been no further constraints on meetings between John and his attorney, and there is no reason to believe there will be any in the future, especially in light of the fact that John has been living with his aunt in Rhode Island for more than a year.

*B. The Statutory and Regulatory Framework*

The care and protection statute under which DSS was proceeding declares it to be the policy of the Commonwealth of Massachusetts to

> insure that the children of the commonwealth are protected against the harmful effects resulting from the absence, inability, inadequacy or destructive behavior of parents or parent substitutes, *and to assure good substitute parental care* in the event of the absence, temporary or permanent inability or unfitness of parents to provide care and protection for their children.

M.G.L. ch. 119, § 1 (emphasis added). *See also* M.G.L. ch. 119, § 24 (authorizing juvenile court to order DSS to take temporary custody of child who appears from facts recited in verified petition to be suffering from "serious abuse or neglect"). At the same time, the statute and the regulations under it

also declare it to be the policy of the Commonwealth to "strengthen[ ] and encourage[ ] . . . family life for the protection and care of children," M.G.L. ch. 119, § 1, and "to maintain the family unit intact" to the extent possible. Mass.Regs.Code tit. 110, § 1.01 (1993). It seems inevitable that these two policies will, on occasion, clash, as the regulations themselves candidly acknowledge:

> These dual obligations—to protect children and yet simultaneously to respect the right of families to be free from unwarranted state intervention—present an inherently difficult balance to strike. Yet, this is precisely the Department's mandate. The effort to balance these two basic obligations, above all others, shall govern the Department's activities.

Regs.Code tit. 110, § 1.01. The present case vividly illustrates just how difficult it can be for DSS to carry out in practice its dual mandate of protecting children while minimizing "unwarranted state intervention" in their families' affairs.

Moving from the general to the specific, the Massachusetts care and protection statute further provides in section 21 that when DSS is given "custody" of a child in need of care and protection, it acquires several powers customarily associated with parenthood, including the power: "(1) to determine the child's place of abode, medical care and education; (2) to control visits to the child; [and,] (3) to consent to enlistments, marriages and other contracts otherwise requiring parental consent." M.G.L. ch. 119, § 21. It can readily be seen that, without such powers, DSS would be unable to fulfill the first of its dual obligations: to provide substitute care—to serve, in effect, as a surrogate parent—to children whose natural parents

---

4. This lawsuit purports to be brought on John's behalf by Mrs. Doe, John's mother and next friend. It is not at all clear that Mrs. Doe has standing under Fed.R.Civ.P. 17(c), since John already had a "duly appointed representative," i.e., DSS, and no request was made by Mrs. Doe or Attorney Conlon pursuant to the third sentence of Rule 17(c) to have Mrs. Doe appointed as John's next friend for the particular purpose of bringing this lawsuit. *See Developmental Disabilities Advocacy Center, Inc. v. Melton*, 689 F.2d 281, 284–287 (1st Cir.1982) for a discussion of

the standards that would have applied, *if* a motion had been filed to appoint Mrs. Doe as John's legal representative in this matter. I assume, without deciding, that if such motion had been filed, it would have been within the court's discretion to appoint a guardian ad litem and that, had the court chosen to do so, it would also have been within the court's discretion to appoint someone other than Mrs. Doe. Since defendants did not raise this issue, however, and because it does not appear to be jurisdictional, I will give it no further consideration.

are unable or unwilling to fulfill their parental responsibilities.

As noted, however, the statute also recognizes the continuing interest even unfit parents have in the welfare of their children and the strong policy favoring their acceptance of responsibility, to the fullest extent possible, for childrearing decisions. To accommodate this sometimes conflicting interest, section 21 goes on in the next sentence to provide as follows:

> In the event that the parent or guardian shall object to the carrying out of any power conferred by this paragraph, said parent or guardian may take application to the committing court and said court shall review and make an order on the matter.

*Id.* Thus, where DSS and the parent disagree regarding how a particular power, such as the right to control visitation or to consent to the making of a contract, should be exercised, the parent may challenge DSS's decision in the committing court. In this manner, section 21 strikes a sensible balance between two worthy but not always compatible goals: providing substitute care for neglected or abused children and involving even unfit parents in decisions affecting the welfare of their children.

A comprehensive set of regulations found at Mass.Regs.Code tit. 110, §§ 1.00 *et seq.* provides some additional guidance concerning DSS's specific rights, responsibilities, and procedures with respect to children entrusted to its care. One regulation deals specifically with the procurement of legal services for such children. It provides, in part:

> The Department's legal staff will make reasonable efforts to insure that children who are in substitute care receive legal assistance when they have been injured because of someone's negligence or intentional actions.

Mass.Regs.Code tit. 110, § 7.129(2). Neither the statute nor the regulations address the specific question whether DSS representatives may be present at meetings between children and the attorneys who are engaged to represent them in tort actions against third parties.

### C. Analysis

#### a. Equitable Relief

 John's complaint is moot to the extent it seeks equitable relief, and plaintiffs cannot seriously contend otherwise. No constraints have been imposed since June 1995 on John's right to confer in private with his attorney, and he has freely done so. Further, since John is no longer in DSS custody or even in Massachusetts, there is no reason to believe that the issues he raises are " 'capable of repetition, yet evading review.' " *Boston and Maine Corp. v. Brotherhood of Maintenance of Way Employees,* 94 F.3d 15, 20 (1st Cir.1996) (quoting *Southern Pac. Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911)). *See also Helling v. McKinney,* 509 U.S. 25, 35–36, 113 S.Ct. 2475, 2482, 125 L.Ed.2d 22 (1993) (asserting that in determining whether inmate exposed to environmental tobacco smoke is entitled to injunction, court should take into account whether inmate is, himself, still subject to unreasonably high levels of such smoke following relocation to another institution); *Martin v. Sargent,* 780 F.2d 1334, 1337 (8th Cir.1985) (stating that plaintiff's claim against prison warden for injunction to improve prison conditions was moot because plaintiff was now in a different facility); *Gilday v. Boone,* 657 F.2d 1, 3 (1st Cir.1981) (affirming dismissal of prisoner's claim for injunctive relief regarding deprivations of his constitutional rights resulting from his confinement in segregated detention facility where prisoner was no longer being held in segregated detention). I therefore recommend that the complaint be **DISMISSED** as to DSS and that it be **DISMISSED** as to Tetreault and the other individual defendants to the extent it seeks equitable relief.

#### b. Damages

 The complaint in this case also seeks damages from Tetreault for her alleged violation of John's constitutional right to have access to court. Tetreault has moved to dismiss on the ground of qualified immunity.[5]

---

**5.** Because the only issue before the court with respect to John's damage claim is the defense of qualified immunity, there is no need to consider the separate question whether, assuming Te-

■ Public officials performing discretionary functions are immune from damage claims under 42 U.S.C. § 1983 unless a reasonable public official in the defendant's position would have realized that her conduct violated a constitutional right whose existence was well established and whose contours were well defined. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Singer v. State of Maine,* 49 F.3d 837, 844 (1st Cir.1995). The standard is one of objective reasonableness. " '[T]he relevant question is whether a reasonable official could have believed h[er] actions were lawful in light of clearly established law and the information the official possessed at the time of h[er] allegedly unlawful conduct.' " *Singer,* 49 F.3d at 844 (quoting *Febus–Rodriguez v. Betancourt–Lebron,* 14 F.3d 87, 91 (1st Cir.1994) (other citations omitted)). Since qualified immunity applies whenever the asserted right was not "clearly established," a threshold inquiry in any case in which the defense is raised is whether the asserted constitutional right exists at all. *Singer,* 49 F.3d at 844; *see also Watterson v. Page,* 987 F.2d 1, 7 (1st Cir. 1993) (declaring that "before even reaching qualified immunity, a court ... must ascertain whether the [plaintiff] ... ha[s] asserted a violation of a constitutional right at all").

There can be no question here that Tetreault, a social worker employed by DSS and charged with overall management responsibility for John's case, was performing a discretionary function when, in the exercise of professional judgment, she rejected Attorney Conlon's request that he be permitted to interview John without John's case worker and therapist present. Tetreault is therefore eligible for qualified immunity unless a reasonable social worker would have known that John had a clearly established right on May 3, 1995, to meet in private with his attorney. It is doubtful that John had such right; whether he did or not, at a minimum such right was not clearly established.

In arguing that he had a right to confer with counsel without his case worker and therapist present, John relies primarily on cases such as *Germany v. Vance,* 868 F.2d 9 (1st Cir.1989), and *John L. v. Adams,* 969 F.2d 228 (6th Cir.1992). Those case extended to certain juveniles the right of access to courts which cases such as *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), conferred on adult prisoners in habeas corpus and conditions of confinement cases. *Bounds* and its progeny, including *Germany* and *John L.,* are factually distinguishable, however, and it is far from clear that they should be extended to apply to the very different circumstances of the present case. The plaintiffs in those cases, whether adults or juveniles, had been charged by the state with violating the criminal law, and they had been found beyond reasonable doubt to have committed the unlawful acts of which they were accused. They were thus subjected to an actual or potential loss of personal liberty and the stigma of having been officially branded as criminals or, at least, as delinquents. Their relationship with the state was strongly adversarial.

This case is different. John was not accused of wrongdoing, and he was not placed in DSS care and protection to punish him for anything he had done or failed to do. John was removed from his parents' care because they were unwilling or incapable of discharging their parental responsibilities. DSS, by default, was thus called upon to provide substitute parental care, and any stigma attached to John was purely derivative of his parents' inadequacies. This is not to say that the relationship between a state and a child which the state is seeking to remove from the parental home is invariably nonadversarial, but it is not adversarial in the

---

treault infringed a clearly established constitutional right, she did so with the requisite intent necessary to make such violation actionable. *See, e.g., Germany v. Vance,* 868 F.2d 9, 17–18 (1st Cir.1989) (applying standard of intentional or reckless indifference to. claim of denial of access to courts). It is exceedingly difficult to imagine that plaintiff could prevail on this issue, given that Tetreault, just two days earlier, had

signed a release permitting Attorney Conlon to have complete access to all John's treatment records. Also, there is no evidence that Tetreault was acting other than out of concern for John's well being when she insisted that his case worker and therapist be present at a meeting at which he was to be interviewed by an attorney she hardly knew, about a subject as sensitive and potentially traumatic as sexual abuse.

sense or to the extent it was in *Bounds, Germany,* or *John L.*

Moreover, the state was not the target of John's complaint in the underlying case, as it was in the cited cases. John was not challenging the procedures whereby the Commonwealth sought to have him adjudicated as a child in need of care and protection, and he was not complaining about the conditions under which the Commonwealth was confining him. Rather, John was suing third parties to recover damages for unrelated personal injuries that he had allegedly suffered years before the Commonwealth had any involvement with his care.

█ Putting aside for the moment the fact that John was under the Commonwealth's care and protection when the instant dispute arose, it is highly unlikely that a child in the care of a natural parent has an absolute right to bring lawsuits against third parties for alleged personal injuries, even when those claims are against public officials for alleged civil rights violations. Indeed, most parents, with considerable justification, would consider it absurd even to suggest that they had no say in a decision by their minor child to retain a lawyer (presumably on a contingent fee basis) to bring such a claim.[6] Parents have broad discretion in child rearing, and parental control of children is "an important interest that undeniably warrants deference, and, absent a powerful countervailing interest, protection." *Lassiter v. Dep't Social Services of Durham County,* 452 U.S. 18, 27, 101 S.Ct. 2153, 2159–60, 68 L.Ed.2d 640 (1981) (internal quotations omitted).

Further, if the parent were to make the decision to go forward with the proposed suit, it would be equally implausible to suggest that the minor child could bar the parent from conferences between himself or herself and his or her attorney, or that the parent would not have the right to make all decisions concerning the litigation, including firing the lawyer if the parent felt that the lawyer was incompetent, unethical, or insensitive to the child's needs. *See, e.g., Noe v. True,* 507 F.2d 9, 12 (6th Cir.1974) (stating that "a guardian ad litem has authority to engage counsel, prosecute, control, and direct litigation").

It is not at all clear that the rights of the Commonwealth, when acting in its role as the provider of substitute parental care, are or should be any more circumscribed than those of a natural custodial parent. Indeed, the Constitution may well impose on the Commonwealth an affirmative duty to become actively involved in pending lawsuits by the child against third parties. *See DeShaney v. Winnebago County Dep't of Social Services,* 489 U.S. 189, 200–201, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989) ("When the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."). And, on a practical level, if the Commonwealth, having removed the child from the care and custody of his or her parent, is not monitoring the progress of ongoing litigation involving the child, the performance and professionalism of the child's attorney, and, most important, the toll the litigation may be taking on the minor, who else is there to do so? The minor child is presumed by law to be less than fully competent to make the necessary judgments; the lawyer, as a matter of ethics and common sense, cannot be both the person being monitored and the person doing the monitoring; and the natural parent in a care and protection case is deemed to be unfit. Quite clearly, this heavy responsibility necessarily falls upon the Commonwealth, acting through the social worker to whom case management responsibility is assigned. Hopefully, the social worker, a trained professional, will be up to the task. But if the social worker's judgment is suspect, the natural parent always has the statutory right to petition the committing court for review.

Taking the foregoing considerations into account, it is highly doubtful that a child who has been entrusted to DSS solely for care and protection has an unqualified constitutional right to prosecute claims for personal

---

6. Of course, the parent would not have the final say. Since the statute of limitations would be tolled during the child's minority, *see* M.G.L. ch. 260, § 7, the child would ultimately be able to bring his or her own suit after he or she reached majority, whether the parent concurred or not.

injury against third parties.[7] Certainly such right, if it exists at all, is not "clearly established" by the caselaw. Even if it were, however, it cannot be said that the contours of that right were or are sufficiently well defined to put a social worker such as Tetreault on notice that she would be interfering with such right if, in the good faith exercise of her professional judgment, she decided that she or members of her staff should attend a meeting in which a child in the Commonwealth's substitute parental care was going to be interviewed by outside counsel regarding possible sexual abuse.

To understand and appreciate Tetreault's dilemma, it must be recalled that plaintiffs do not claim that Tetreault's purpose was to prevent John from conferring with Attorney Conlon or to impede Attorney Conlon's efforts to prosecute the Rhode Island litigation. To the contrary, plaintiffs acknowledge that Tetreault authorized the release of all of John's treatment records and permitted Attorney Conlon to meet with John to get the information he needed to respond to the outstanding interrogatories. Nor do plaintiffs claims that the presence of a case worker and therapist per se would inhibit the free flow of communication between John and his attorney. They claim only that such presence would have destroyed the attorney-client privilege and that Tetreault should have known this. More significantly, they implicitly make what can fairly be characterized as a parochial, if not arrogant, assumption that Tetreault should also have known that the need to preserve the attorney-client privilege and, for that matter, to prosecute the Rhode Island litigation to a successful conclusion overrode all other conceivable concerns with respect to John's welfare. Each such claim and assumption is highly suspect.

In the first place, it is not clear that communications between John and Attorney Conlon would have been protected by the attorney-client privilege, where John knew that the information he was providing was to be incorporated into interrogatory responses that were to be disclosed to defendants in the pending litigation. See J. Weinstein & M. Berger, *Weinstein's Evidence* P 503(a)(4)[01] at 503–39–40 (1996) ("If client intended to make a document public, the requisite confidentiality is lacking. For example, information communicated by a client which he knew would be disclosed in legal documents ... is outside the privilege.").

Assuming that communications between John and Attorney Conlon would have been privileged, it is far from clear that the presence of John's case worker and therapist would destroy the privilege, any more than the presence of a custodial parent for a minor child would do so. *See, e.g., Kevlik v. Goldstein*, 724 F.2d 844, 849 (1st Cir.1984) (declaring that attorney-client privilege was not destroyed by presence of client's father because it is the intent of the client which controls whether a conversation is privileged); *United States v. Bigos*, 459 F.2d 639, 643 (1st Cir.) *cert. denied* 409 U.S. 847, 93 S.Ct. 53, 34 L.Ed.2d 88 (1972) (stating that "[w]hile we agree that the presence of a third party commonly destroys the privilege, it does so only insofar as it is indicative of the intent of the parties that their communication not be confidential," and presence of client's father did not indicate such an intent); *Schreiber v. Kellogg*, 1992 WL 309632 (E.D.Pa. Oct. 19, 1992) at *1 (declaring that presence of defendant's father, at a meeting between defendant and his lawyer, did not defeat the attorney-client privilege, when father was only "taking an ordinary parental interest and advisory role in this son's legal affairs"). At a minimum, it can safely be said that the effect on the privilege of a case worker's and therapist's presence would raise legal issues that are far too complex to be analyzed and resolved on the spot even by an experienced attorney, let alone by a social worker untrained in the law. Finally, and in any event, it is doubtful that preservation of the privilege or, for that matter, the successful prosecution of a claim for personal injury invariably take precedence over a child's immediate emotional and psychological needs; it is even more doubtful that the decision about whether it does in a particular case

---

7. Of course, such child would be able to assert such claim when he or she reached majority, just as a child in the custody of a natural parent would. *See* M.G.L. ch. 260, § 7 (statutes of limitation tolled during period of child's minority).

should be made unilaterally by outside counsel, rather than by a social worker whose decision is subject to judicial review by the committing court.

It is unnecessary to resolve any of these issues for purposes of deciding whether Tetreault is entitled to qualified immunity. Merely to state them is sufficient to demonstrate that a reasonable social worker in Tetreault's position would have been substantially uncertain whether a decision such as the one Tetreault made here would genuinely and materially interfere with a minor child's right to prosecute a claim against third parties for personal injury, assuming such right existed and was well established.

Because it is not clearly established that minors receiving substitute parental care from the Commonwealth have an unqualified right to assert personal injury claims against third parties, and because, in any event, a reasonable social worker would not have understood that her decision to attend an interview in which the minor was to be interviewed by outside counsel regarding possible sexual abuse would so interfere with such right as to constitute a violation, Tetreault is entitled to qualified immunity. I therefore recommend that all claims for damages against Tetreault, as well as those against other unknown defendants, be **DISMISSED.**

### III. CONCLUSION AND RECOMMENDATION

For all the foregoing reasons, I recommend that Defendants' Motion to Dismiss be **ALLOWED.**

### IV. IMPORTANT NOTICE OF RIGHT TO OBJECT AND WAIVER OF RIGHT TO APPEAL FOR FAILURE TO DO SO WITHIN TEN DAYS

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court **WITHIN 10 DAYS** of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court's order entered pursuant to this Report and Recommendation. *See United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980); *United States v. Vega,* 678 F.2d 376 (1st Cir.1982); *Scott v. Schweiker,* 702 F.2d 13 (1st Cir.1983); *see also Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).