UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 95-1275

RONALD C. BROWN, ET AL.,
Plaintiffs - Appellants,

v.

HOT, SEXY AND SAFER PRODUCTIONS, INC., ET AL.,
Defendants - Appellees.


APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, U.S. District Judge] 


Before

Torruella, Chief Judge, 

Stahl, Circuit Judge, 

and Dom nguez,* District Judge. 


John L. Roberts for appellant. 
John Foskett, with whom Deutsch Williams Brooks DeRensis 
Holland & Drachman, P.C., Paul F. Degnan, Nancy Kirk, Kirby & 
Associates, Mary L. Bonauto, Bennett H. Klein, Gay & Lesbian 
Advocates & Defenders, Neila J. Straub and Straub & Meyers were 
on joint brief for appellees Chelmsford School Committee, Wendy
Marcks, Mary E. Frantz, Richard H. Moser, David S. Troughton,
George J. Betses, Suzanne Landolphi and Hot, Sexy & Safer
Productions, Inc.; Frances S. Cohen, with whom Monica L. 
Phillips, Hill & Barlow, Susan Wunsch and Massachusetts Civil 
Liberties Union Foundation were on brief for appellees Michael
Gilchrist and Judith Hass.



October 23, 1995

 

* Of the District of Puerto Rico, sitting by designation.

TORRUELLA, Chief Judge. The plaintiffs are two minors TORRUELLA, Chief Judge. 

and their parents. The minors allege that they were compelled to

attend an indecent AIDS and sex education program conducted at

their public high school by defendant Hot, Sexy and Safer

Productions ("Hot, Sexy, and Safer"). Plaintiffs allege, inter 

alia, that the compelled attendance deprived the minors of their 

privacy rights and their right to an educational environment free

from sexual harassment. The district court granted the

defendants' motion to dismiss under Federal Rule of Civil

Procedure 12(b)(6). We affirm.

BACKGROUND BACKGROUND

The plaintiffs are Chelmsford High School students

Jason P. Mesiti ("Mesiti") and Shannon Silva ("Silva"), and their

parents Ronald and Suzanne Brown ("the Browns"), and Carol and

Richard Dubreuil ("the Dubreuils"). The plaintiffs' complaint

alleges the following facts, which we take as true for purposes

of this appeal. On April 8, 1992, Mesiti and Silva attended a

mandatory, school-wide "assembly" at Chelmsford High School.

Both students were fifteen years old at the time. The assembly

consisted of a ninety-minute presentation characterized by the

defendants as an AIDS awareness program (the "Program"). The

Program was staged by defendant Suzi Landolphi ("Landolphi"),

contracting through defendant Hot, Sexy, and Safer, Inc., a

corporation wholly owned by Landolphi.

Plaintiffs allege that Landolphi gave sexually explicit

monologues and participated in sexually suggestive skits with

-2-

several minors chosen from the audience. Specifically, the

complaint alleges that Landolphi: 1) told the students that they

were going to have a "group sexual experience, with audience

participation"; 2) used profane, lewd, and lascivious language to

describe body parts and excretory functions; 3) advocated and

approved oral sex, masturbation, homosexual sexual activity, and

condom use during promiscuous premarital sex; 4) simulated

masturbation; 5) characterized the loose pants worn by one minor

as "erection wear"; 6) referred to being in "deep sh--" after

anal sex; 7) had a male minor lick an oversized condom with her,

after which she had a female minor pull it over the male minor's

entire head and blow it up; 8) encouraged a male minor to display

his "orgasm face" with her for the camera; 9) informed a male

minor that he was not having enough orgasms; 10) closely

inspected a minor and told him he had a "nice butt"; and 11) made

eighteen references to orgasms, six references to male genitals,

and eight references to female genitals.

Plaintiffs maintain that the sexually explicit nature

of Landolphi's speech and behavior humiliated and intimidated

Mesiti and Silva. Moreover, many students copied Landolphi's

routines and generally displayed overtly sexual behavior in the

weeks following the Program, allegedly exacerbating the minors'

harassment. The complaint does not allege that either of the

minor plaintiffs actually participated in any of the skits, or

were the direct objects of any of Landolphi's comments.

The complaint names eight co-defendants along with Hot,

-3-

Sexy, and Safer, and Landolphi, alleging that each played some

role in planning, sponsoring, producing, and compelling the minor

plaintiffs' attendance at the Program. In March 1992, defendant

Judith Hass ("Hass"), then chairperson of the Chelmsford Parent

Teacher Organization (the "PTO"), initiated negotiations with

Hot, Sexy, and Safer. Hass and defendant Michael Gilchrist,

M.D., also a member of the PTO, as well as the school physician,

viewed a promotional videotape of segments of Landolphi's past

performances and then recommended the Program to the school

administration. On behalf of defendant Chelmsford School

Committee (the "School Committee"), Hass executed an agreement

with Hot, Sexy, and Safer, and authorized the release of $1,000

of Chelmsford school funds to pay Landolphi's fee.

The complaint also names as defendants two other

members of the School Committee, Wendy Marcks and Mary E. Frantz,

as well as the Superintendent and Assistant Superintendent of the

Chelmsford Public Schools, Richard H. Moser, and David S.

Troughton, and the Principal of Chelmsford High School, George J.

Betses. Plaintiffs allege that all the defendants participated

in the decisions to hire Landolphi, and to compel the students to

attend the Program. All the defendants were physically present

during the Program.

A school policy adopted by the School Committee

required "[p]ositive subscription, with written parental

permission" as a prerequisite to "instruction in human

sexuality." The plaintiffs allege, however, that the parents

-4-

were not given advance notice of the content of the Program or an

opportunity to excuse their children from attendance at the

assembly.

The district court granted defendants' motion to

dismiss plaintiffs' complaint, pursuant to Federal Rule of Civil

Procedure 12(b)(6), for failure to state a claim upon which

relief may be granted, and also dismissed the state law claims

under the supplemental jurisdiction principles of 28 U.S.C. 

1367.1 The district court deferred entry of final judgment,

giving plaintiffs leave to file an amended complaint curative of

the deficiencies by February 10, 1995. Plaintiffs failed to do

so, and final judgment was entered on March 3, 1995, dismissing

their claims. 

STANDARD OF REVIEW STANDARD OF REVIEW

We exercise de novo review over a district court's 

dismissal of a claim under Rule 12(b)(6). Vartanian v. Monsanto 

Co., 14 F.3d 697, 700 (1st Cir. 1994); Kale v. Combined Ins. Co. 

of America, 924 F.2d 1161, 1165 (1st Cir. 1991). We accept the 

allegations of the complaint as true, and determine whether,

under any theory, the allegations are sufficient to state a cause

of action in accordance with the law. Vartanian, 14 F.3d at 700; 

Knight v. Mills, 836 F.2d 659 (1st Cir. 1987). Although, our 

review is plenary, an appeal is not an opportunity to conjure new

 

1 28 U.S.C. 1367(c) gives a court discretion to "decline to
exercise supplemental jurisdiction over a [state law] claim
[where] the district court has dismissed all claims over which it
has original jurisdiction."

-5-

arguments not raised before the district court. McCoy v. 

Massachusetts Inst. of Tech., 950 F.2d 13, 22 (1st Cir. 1991), 

cert. denied, 112 S. Ct. 1939 (1992). In addition, "[b]ecause 

only well pleaded facts are taken as true, we will not accept a

complainant's unsupported conclusions or interpretations of law."

Washington Legal Found. v. Massachusetts Bar Found., 993 F.2d 

962, 971 (1st Cir. 1993)(citations omitted). We may affirm a

district court's dismissal order under any independently

sufficient grounds. Id. 

DISCUSSION DISCUSSION

The plaintiffs seek both declaratory and monetary

relief, alleging that the school sponsored program deprived the

minor plaintiffs of: (1) their privacy rights under the First

and Fourteenth Amendments; (2) their substantive due process

rights under the First and Fourteenth Amendments; (3) their

procedural due process rights under the Fourteenth Amendment; and

(4) their First Amendment rights under the Free Exercise Clause

(in conjunction with a deprivation of the parent plaintiffs'

right to direct and control the upbringing of their children).

Plaintiffs also allege that the Program created a sexually

hostile educational environment in violation of Title IX of the

Education Amendments of 1972, 20 U.S.C. 1681 et seq.2  

As an initial matter, we briefly address defendants'

assertion of the defense of qualified immunity. Plaintiffs seek

 

2 The complaint also alleges five state law claims which are
irrelevant for purposes of this appeal.

-6-

monetary damages under 42 U.S.C. 1983,3 and defendants assert

the affirmative defense of qualified immunity, which shields

public officials performing discretionary functions from

liability for civil damages "insofar as their conduct does not

violate clearly established statutory or constitutional rights of

which a reasonable person would have known." Harlow v. 

Fitzgerald, 457 U.S. 800, 818 (1982). A right is "clearly 

established" if, at the time of the alleged violation, "[t]he

contours of the right [are] sufficiently clear that a reasonable

official would understand that what he is doing violates that

right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "[T]he 

relevant question is whether a reasonable official could have

believed his actions were lawful in light of clearly established

law and the information the official possessed at the time of his

allegedly unlawful conduct." Singer v. Maine, 49 F.3d 837, 844 

(1st Cir. 1995) (citations omitted). The Supreme Court has

explained that: "A necessary concomitant to the determination of

whether the constitutional right asserted by a plaintiff is

'clearly established' at the time the defendant acted is the

determination of whether the plaintiff has asserted a violation

of a constitutional right at all." Siegert v. Gilley, 500 U.S. 

226, 232 (1991). Therefore, "before even reaching qualified

immunity, a court of appeals must ascertain whether the

appellants have asserted a violation of a constitutional right at
 

3 Section 1983 provides a remedy against any person who, under
color of state law, deprives a citizen of his or her
constitutional rights. 42 U.S.C. 1983.

-7-

all." Watterson v. Page, 987 F.2d 1, 7 (1st Cir. 1993); Singer, 

49 F.3d at 844. Thus, as a predicate to the objective

reasonableness inquiry, "a plaintiff must establish that a

particular defendant violated the plaintiff's federally protected

rights." Singer, 49 F.3d at 844 (citations omitted). 

Accordingly, we first address each of the plaintiffs'

claims to determine whether it states a cause of action under

federal law. If any of the claims meet this threshold

requirement, we will then proceed to the issue of qualified

immunity.

I. Privacy Rights and Substantive Due Process I. Privacy Rights and Substantive Due Process 

The Fourteenth Amendment provides that "[n]o State

shall . . . deprive any person of life liberty or property

without due process of law." U.S. Const. amend XIV. The

substantive component of due process protects against "certain

government actions regardless of the fairness of the procedures

used to implement them." Daniels v. Williams, 474 U.S. 327, 331 

(1986). See also Pittsley v. Warish, 927 F.2d 3, 6 (1st Cir. 

1991) (comparing substantive due process to procedural due

process) (citing Monroe v. Pape, 365 U.S. 167, 171-72 (1961)). 

There are two theories under which a plaintiff may bring a

substantive due process claim. Under the first, a plaintiff must

demonstrate a deprivation of an identified liberty or property

interest protected by the Fourteenth Amendment. Pittsley, 927 

F.2d at 6 (citing Meyer v. Nebraska, 262 U.S. 390, 399 (1923)). 

Under the second, a plaintiff is not required to prove the

-8-

deprivation of a specific liberty or property interest, but,

rather, he must prove that the state's conduct "shocks the

conscience." Id. at 6 (quoting Rochin v. California, 342 U.S. 

165, 172 (1952)). Plaintiffs contend that compelling the minors'

attendance at the Program constitutes a substantive due process

violation under both tests.

A. Conscience Shocking Behavior A. Conscience Shocking Behavior 

Plaintiffs' claim that the defendants engaged in

conscience shocking behavior when they compelled the minor

plaintiffs to attend the Program. The Supreme Court set the

standard for analyzing claims of conscience shocking behavior in

Rochin. In that case, the Court held that the government could 

not use evidence obtained by pumping a defendant's stomach

against his will because the state actor's conduct was so

egregious that it "shock[ed] the conscience" and offended even

"hardened sensibilities." Rochin, 342 U.S. at 172. The Court 

explained that the stomach pumping employed by the state was "too

close to the rack and screw to permit of constitutional

differentiation." Id.  

Similarly, we have found "conscience shocking" conduct

only where the state actors engaged in "extreme or intrusive

physical conduct." Souza v. Pina, 53 F.3d 423, 427 (1st Cir. 

1995); Harrington v. Almy, 977 F.2d 37, 43-44 (1st Cir. 1992) 

(reasonable fact-finder could find "conscience shocking" conduct

where a police officer charged with child abuse was required to

-9-

take a penile plethysmograph4 as a condition of his

reinstatement). See also Garc a v. Meira, 817 F.2d 650, 655 

(10th Cir. 1987) (corporal punishment of students may "shock the

conscience" if it "caused injury so severe, was so

disproportionate to the need presented, and was so inspired by

malice or sadism . . . that it amounted to a brutal and inhumane

abuse of official power") (quoting Hall v. Tawney, 621 F.2d 607, 

613 (4th Cir. 1980)).

Although we have not foreclosed the possibility that

words or verbal harassment may constitute "conscious shocking"

behavior in violation of substantive due process rights, see 

Souza, 53 F.3d at 427; Pittsley, 927 F.2d at 6, our review of the 

caselaw indicates that the threshold for alleging such claims is

high and that the facts alleged here do not rise to that level.

In Souza, the plaintiff alleged that the prosecutor had 

caused the suicide of her son by conducting press conferences in

which he encouraged the media to link the son to a string of

serial murders. The plaintiff further alleged that the

prosecutor knew of her son's suicidal tendencies and should have

known that he would take his own life as a result of the

accusations. Although we "pause[d] to make clear that we do not

condone the conduct alleged by Souza," we nevertheless found that

the conduct was not "conscience shocking." Souza, 53 F.3d at 

424-27.
 

4 A penile plethysmograph assesses a person's sexual profile by
the placement of a gauge on the subjects' penis while he views
various sexually explicit slides of both adults and children. 

-10-

In Pittsley, police officers told two young children -- 

ages four and ten -- that "if we ever see your father on the

street again, you'll never see him again." Pittsley, 927 F.2d at 

5. When the police subsequently arrested the children's father,

they "use[d] vulgar language" and refused to let the children

give their father a hug and kiss goodbye. Id. In affirming the 

directed verdicts for defendants, we explained: "As despicable

and wrongful as it may have been, the single threat made by the

officers is not sufficient to 'shock the conscience.'" Id. at 7. 

The facts alleged at bar are less severe than those

found insufficient in Souza and Pittsley. The minor teenagers in 

this case were compelled to attend a sexually explicit AIDS

awareness assembly without prior parent approval. While the

defendants' failure to provide opt-out procedures may have

displayed a certain callousness towards the sensibilities of the

minors, their acts do not approach the mean-spirited brutality

evinced by the defendants in Souza and Pittsley. We accordingly 

hold that the acts alleged here, taken as true, do not constitute

conscience shocking and thus fail to state a claim under Rochin. 

B. Protected Liberty Interests B. Protected Liberty Interests 

The Supreme Court has held that the Fourteenth

Amendment encompasses a privacy right that protects against

significant government intrusions into certain personal

decisions. See Roe v. Wade, 410 U.S. 113, 152 (1973). This 

right of privacy "has some extension to activities relating to

marriage, procreation, contraception, family relationships, and

-11-

child rearing and education." Id. (citations omitted). 

Nevertheless, the Supreme Court has explained that only those

rights that "can be deemed 'fundamental' or 'implicit in the

concept of ordered liberty' are included in this guarantee of

personal privacy." Id. (quoting Palko v. Connecticut, 302 U.S. 

319, 325 (1937)). Regulations limiting these "fundamental

rights" may be justified "only by a 'compelling state interest' .

. . [and] must be narrowly drawn to express only the legitimate

interests at stake." Id. (citations omitted). 

1. Right to Rear Children 1. Right to Rear Children 

Parent-plaintiffs allege that the defendants violated

their privacy right to direct the upbringing of their children

and educate them in accord with their own views. This, they

maintain, is a constitutionally protected "fundamental right" and

thus can only be infringed upon a showing of a "compelling state

interest" that cannot be achieved by any less restrictive means.

The genesis of the right claimed here can be found in

Meyer v. Nebraska, 262 U.S. 390 (1923), and Pierce v. Society of 

Sisters, 268 U.S. 510, 535 (1925). In Meyer, the Court struck 

down a state law forbidding instruction in certain foreign

languages in part because it arbitrarily interfered with the

"right of parents" to procure such instruction for their

children. Meyer, 262 U.S. at 400. In so holding, the Court 

stated:

While this Court has not attempted to
define with exactness the liberty
[guaranteed by the due process clause of
the Fourteenth Amendment], the term has

-12-

received much consideration and some of
the included things have been definitely
stated. Without doubt, it denotes not
merely freedom from bodily restraint but
also the right of the individual to
contract, to engage in any of the common
occupations of life, to acquire useful
knowledge, to marry, to establish a home
and bring up children, to worship God
according to the dictates of his own
conscience, and generally to enjoy those
privileges long recognized at common law
as essential to the orderly pursuit of
happiness by free men.

Id. at 399. 

Two years later the Court in Pierce struck down a state 

statute requiring public school attendance -- and thus precluding

attendance at parochial schools -- because it "unreasonably

interfere[d] with the liberty of parents or guardians to direct

the upbringing and education of children under their control."

268 U.S. at 534-35. The Meyer and Pierce decisions have since 

been interpreted by the Court as recognizing that, under our

Constitutional scheme, "the custody, care and nurture of the

child reside first in the parents." Prince v. Massachusetts, 321 

U.S. 158, 166 (1944); see Wisconsin v. Yoder, 406 U.S. 205, 232- 

33 (1972).

Nevertheless, the Meyer and Pierce cases were decided 

well before the current "right to privacy" jurisprudence was

developed, and the Supreme Court has yet to decide whether the

right to direct the upbringing and education of one's children is

among those fundamental rights whose infringement merits

heightened scrutiny. We need not decide here whether the right

to rear one's children is fundamental because we find that, even

-13-

if it were, the plaintiffs have failed to demonstrate an

intrusion of constitutional magnitude on this right.5

The Meyer and Pierce cases, we think, evince the 

principle that the state cannot prevent parents from choosing a

specific educational program -- whether it be religious

instruction at a private school or instruction in a foreign

language. That is, the state does not have the power to

"standardize its children" or "foster a homogenous people" by

completely foreclosing the opportunity of individuals and groups

to choose a different path of education. Meyer, 262 U.S. at 402, 

discussed in, Tribe, supra, 15-6 at 1319. We do not think, 

however, that this freedom encompasses a fundamental

constitutional right to dictate the curriculum at the public

 

5 The issue is muddled because the Meyer and Pierce cases were 
decided on the grounds that the "statute as applied is arbitrary
and without reasonable relation to any end within the competency
of the state." Meyer, 262 U.S. at 403; Pierce, 268 U.S. at 534- 
36. Indeed, the opinions indicate that something less than the
current "compelling state interest" test was then used to
evaluate a substantive due process challenge involving one of the
listed liberty interests: "The established doctrine is that this
liberty may not be interfered with, under the guise of protecting
the public interest, by legislative action which is arbitrary or
without reasonable relation to some purpose within the competency
of the State to effect." Meyer, 262 U.S. at 399-400; see also 
Pierce, 268 U.S. at 535. 

Moreover, it should be noted that these cases were decided in
the 1920's, before the Bill of Rights was incorporated into the
Fourteenth Amendment, and would probably be decided today on
First Amendment grounds. Rotunda & Nowak, Treatise on 
Constitutional Law: Substance and Procedure, 21.7 (2d ed. 
1992); Laurence H. Tribe, American Constitutional Law, 15-6 at 
1319-20 (1988) (suggesting that they reflect the First
Amendment's limit on the state's ability to "contract the
spectrum of available knowledge") (quoting Griswold v. 
Connecticut, 381 U.S. 479, 482 (1965)). 

-14-

school to which they have chosen to send their children. See 

Rotunda & Nowak, supra, 18.28 n.25. We think it is 

fundamentally different for the state to say to a parent, "You

can't teach your child German or send him to a parochial school,"

than for the parent to say to the state, "You can't teach my

child subjects that are morally offensive to me." The first

instance involves the state proscribing parents from educating

their children, while the second involves parents prescribing

what the state shall teach their children. If all parents had a

fundamental constitutional right to dictate individually what the

schools teach their children, the schools would be forced to

cater a curriculum for each student whose parents had genuine

moral disagreements with the school's choice of subject matter.

We cannot see that the Constitution imposes such a burden on

state educational systems, and accordingly find that the rights

of parents as described by Meyer and Pierce do not encompass a 

broad-based right to restrict the flow of information in the

public schools.6 

2. Right to be Free from Offensive Speech 2. Right to be Free from Offensive Speech 
 

6 Plaintiffs claim that Alfonso v. Fern ndez, 606 N.Y.S.2d 259 
(A.D.2 Dept. 1993), supports their position that they have a
fundamental right to preclude the schools from teaching subjects
that they find objectionable. The court in Alfonso did hold that 
the parental right to direct the upbringing of their children was
fundamental and that it was violated by a program providing for
condom distribution at a public high school. However, the
court's holding specifically distinguished the condom
distribution program from exposure "to talk or literature on the
subject of sexual behavior," finding that the latter claim would
"falter in the face of the public school's role in preparing
students for participation in a world replete with complex and
controversial issues." Id. at 266. 

-15-

The minor plaintiffs maintain that the defendants'

conduct violated their privacy right to be free from "exposure to

vulgar and offensive language and obnoxiously debasing portrayals

of human sexuality." Plaintiffs cite no cases -- and we have

found none -- indicating that such a fundamental privacy right

exists. Rather, they attempt to extract the claimed privacy

right from the Supreme Court's First Amendment cases which uphold

the state's limited power to regulate or discipline speech to 

protect minors from offensive or vulgar speech. See Bethel Sch. 

Dist. No. 403 v. Fraser, 478 U.S. 675, 685 (1986)(cited for the 

proposition that "[a] high school assembly or classroom is no

place for a sexually explicit monologue directed towards an

unsuspecting audience of teenage students"); FCC v. Pacifica 

Found., 438 U.S. 726 (1978). We agree with the district court 

that these cases "do not create a private cause of action against

state officials for exposure" to patently offensive language.7

II. Procedural Due Process II. Procedural Due Process 

The plaintiffs' third claim alleges that their

procedural due process rights under the Fourteenth Amendment were

violated when the defendants compelled the minor plaintiffs to

attend the Program without giving the parents advance notice and

 

7 The Supreme Court has explained that a special situation
pertains where a free exercise challenge is brought in
conjunction with a substantive due process challenge involving
the right of parents to direct the upbringing of their children.
See Employment Div. v. Smith, 494 U.S. 872, 881-82 (1990); 
Wisconsin v. Yoder, 406 U.S. 205, 233-34 (1972). We therefore 
analyze this "hybrid right" along with their free exercise
challenge. See infra. 

-16-

an opportunity to opt out of attending.

"In procedural due process claims, the deprivation by

state action of a constitutionally protected interest in 'life,

liberty, or property' is not in itself unconstitutional; what is

unconstitutional is the deprivation of such an interest without 

due process of law." Zinermon v. Burch, 494 U.S. 113, 125 (1990) 

(quoting Parratt v. Taylor, 451 U.S. 527, 537 (1981)). 

Application of this prohibition requires a well settled two-stage

analysis. We first decide whether the asserted individual

interests are encompassed within the Fourteenth Amendment's

protection of "life, liberty or property." If protected

interests are implicated, we then must decide what procedures

constitute "due process of law." Ingraham v. Wright, 430 U.S. 

651, 672 (1977) (citations omitted). Protected liberty interests

may arise from two sources -- the Due Process Clause itself and

the laws of the states. Kentucky Dept. of Corrections v. 

Thompson, 490 U.S. 454, 460 (1989) (citations omitted). 

The liberty preserved from deprivation without due

process includes the right "generally to enjoy those privileges

long recognized at common law as essential to the orderly pursuit

of happiness by free men." Meyer, 262 U.S. at 399. As 

previously discussed, however, the liberty protected by the

Fourteenth Amendment does not encompass a right to be free from

exposure to speech which one regards as offensive. Thus, the

plaintiffs' asserted liberty interest, if one exists, must derive

from state law.

-17-

The plaintiffs contend that state law and the School

Committee's policy on "Sex Education" (the "Sex Education

Policy") confers a protected liberty interest, and that the

defendants' actions deprived them of it without due process.

Specifically, the complaint alleges that the defendants failed to

follow the school's Sex Education Policy, which provides:

The Committee believes that the public
schools can best transmit information on
human sexuality to students in the
context of the health education
continuum. Therefore, information and
instructional tools appropriate to the
age group will be used to include
instruction in human sexuality in the
curricular offerings on health. Positive 
subscription, with written parental 
permission, will be a prerequisite to 
enrolling.  

(Emphasis added.) The complaint further alleges that the parents

were not given advance notice of the contents of the Program or

an opportunity to opt out.

Defendants concede for the purposes of their motion

that the Sex Education Policy confers a liberty interest in

freedom from exposure to the content of the Program and in being

afforded an opportunity to opt out.8 They argue, however, that

the plaintiffs still fail to state a claim because the violation

of the Sex Education Policy was a "random and unauthorized" act

 

8 The plaintiffs also maintain that Mass. Ann. Laws ch. 71, 1
(1995) confers a protected liberty interest. That statute grants
a right to opt out from "instruction on disease" to students
whose "sincerely held religious beliefs" conflict with such
instruction. Defendants assume for the purposes of this appeal
that Mass. Gen. L. ch. 71, 1 is an alternative source for the
claimed liberty interest.

-18-

within the confines of the Parratt-Hudson doctrine. Hudson v. 

Palmer, 468 U.S. 517 (1984); Parratt, 451 U.S. 527. The 

plaintiffs maintain that their claim is more akin to that stated

in Zinermon, and is thus outside the scope of the Parratt-Hudson 

doctrine.

In Parratt, a state prisoner brought a 1983 action 

because prison employees had negligently lost materials he had

ordered by mail. The Supreme Court ruled that the prisoner's

post-deprivation tort remedy was all the process that was due

because the state could not have provided any predeprivation

procedural safeguard to address the risk of this kind of random

and unauthorized deprivation. Parratt, 451 U.S. at 541. As the 

Court explained, "the loss is not a result of some established

state procedure and the State cannot predict precisely when the

loss will occur. It is difficult to conceive of how the State

could provide a meaningful hearing before the deprivation takes

place." Id. In Hudson, the Supreme Court extended this 

reasoning to intentional deprivations of property, explaining

that "[t]he state can no more anticipate the random and

unauthorized intentional conduct of its employees than it can

similar negligent conduct." Hudson, 468 U.S. at 533. 

Parratt and Hudson preclude 1983 claims for the 

"random and unauthorized" conduct of state officials because the

state cannot "anticipate and control [such conduct] in advance."

Zinermon, 494 U.S. at 130. In addition, the Court has made clear 

that unauthorized deprivations of property by state employees do

-19-

not constitute due process violations under the Fourteenth

Amendment so long as meaningful postdeprivation remedies are

available. Id. at 128-30. Moreover, the Court has emphasized 

that "no matter how significant the private interest at stake and

the risk of its erroneous deprivation, the State cannot be

required constitutionally to do the impossible by providing

predeprivation process." Id. at 129 (citations omitted). 

Therefore, "the proper inquiry under Parratt is whether the state 

is in a position to provide for predeprivation process." Id. at 

130 (quotation omitted).

Zinermon involved a due process claim against the state 

doctors who admitted the plaintiff Burch as a "voluntary" mental

patient. Burch alleged that he was incompetent at the time of

his admission and should have been afforded the protections

provided by the involuntary placement procedure. Although the

Court found that Parratt-Hudson doctrine applied to deprivations 

of liberty, it nevertheless concluded that Burch had failed to

state a viable 1983 claim. Id. at 131-32. 

The court found that Burch's claim was not controlled

by Parratt and Hudson for three basic reasons. First, the Court 

explained that the timing of Burch's deprivation of liberty was

more predictable than in Parratt and Hudson. As the Court 

explained, "it is hardly unforeseeable that a person requesting

treatment for mental illness might be incapable of informed

consent." Id. at 136. Thus, "[a]ny erroneous deprivation will 

occur, if at all, at a specific, predicable point in the

-20-

admission process." Id. Second, the Court found that the state 

could have provided meaningful predeprivation process and

possibly averted the deprivation Burch alleged. Third, the Court

found that because the state had delegated the hospital officials

broad authority to "effect the very deprivation complained of

here," their conduct could not be characterized as "unauthorized"

in the same sense as the destruction of the prisoners' property

in Parratt and Hudson. 

The Parratt-Hudson-Zinermon trilogy "requires that 

courts scrutinize carefully the assertion by state officials that

their conduct is 'random and unauthorized' . . . where such a

conclusion limits the procedural due process inquiry under 1983

to the question of the adequacy of state postdeprivation

remedies." Lowe v. Scott, 959 F.2d 323, 341 (1st Cir. 1992).9 

Our examination here leads us to agree with the district court

that the plaintiffs' claim falls within the Parratt-Hudson 

doctrine.

The plaintiffs have not alleged any facts that would

bring their claim within the scope of Zinermon. They point to no 

facts suggesting that the state could have predicted the

 

9 Other circuits have interpreted the doctrine similarly. See 
Caine v. Hardy, 943 F.2d 1406, 1413 (5th Cir. 1991) (en banc) 
("Zinermon thus requires a hard look at a Parratt/Hudson defense 
to determine whether the state officials' conduct, under all the
circumstances, could have been adequately foreseen and addressed
by procedural safeguards."); Easter House v. Felder, 910 F.2d 
1387, 1402 (7th Cir.1990) (en banc), cert. denied, 111 S. Ct. 783 
(1991) (concluding that "Zinermon holds only that predictable 
deprivations of liberty and property which flow from authorized
conduct are compensable under 1983").

-21-

defendants' failure to give the required notice and opt-out

opportunity, nor do they suggest any reasonable additional

predeprivation procedures which would have meaningfully reduced

the risk of the due process violation alleged.

The plaintiffs contend that the deprivation cannot be

characterized as "random and unauthorized" because the

performance was planned well in advance. This contention ignores

both the nature of the deprivation and the relevant caselaw. The

deprivation alleged here is not the staging of the Program

itself, but rather the defendants' failure to follow the

procedures mandated by the Sex Education Policy. Moreover, the

Supreme Court has established that the Parratt-Hudson doctrine 

applies to both negligent and intentional tortious acts of state

actors, explaining that "it would be absurd to suggest that the

State hold a hearing to determine whether a [state official]

should engage in such conduct." Hudson, 468 U.S. at 533. That 

reasoning is applicable here. The plaintiffs have not alleged

any facts from which a court could reasonably infer that any

defendant was vested with "the power and authority to effect the

very deprivation complained of here." Zinermon, 494 U.S. at 

138.10 Rather, the Sex Education Policy states that

"[p]ositive subscription, with parental permission, will be a

prerequisite to enrolling," and, accordingly, vested no
 

10 As the district court noted, although three defendants were
members of the School Committee (which adopted the Sex Education
Policy), the plaintiffs do not allege that these defendants,
either individually or as a group, were authorized to circumvent
a policy adopted and enacted by the School Committee as a whole.

-22-

discretion in school officials. We therefore conclude that the

failure to follow the Sex Education Policy was a "random and

unauthorized" act within the confines of the Parratt-Hudson 

doctrine.

The second stage of a Parratt-Hudson analysis looks to 

whether the state has provided adequate postdeprivation remedies.

Lowe, 959 F.2d at 340 (discussing Parratt, 451 U.S. 527). The 

plaintiffs did not argue to the district court that the state

remedies were inadequate, relying instead on their belief that

Zinermon was controlling. On appeal, they do no more than state 

baldly that "[n]o post-deprivation procedures can undo the

damaging influences which were impressed on the students during

the performance." Accordingly, we deem this point waived for

appellate review, see United States v. Zannino, 895 F.2d 1, 17 

(1st Cir.), cert. denied, 494 U.S. 1082 (1990) (discussing the 

"settled appellate rule that issues adverted to in a perfunctory

manner, unaccompanied by some effort at developed argumentation,

are deemed waived"), and therefore find that the plaintiffs have

failed to state a procedural due process claim.

III. Free Exercise Clause III. Free Exercise Clause 

Plaintiffs' fourth claim seeks both monetary and

declaratory relief, alleging that the defendants' endorsement and

encouragement of sexual promiscuity at a mandatory assembly

"imping[ed] on their sincerely held religious values regarding

chastity and morality," and thereby violated the Free Exercise

Clause of the First Amendment.

-23-

In Employment Div., Oregon Dep't of Human Resources v. 

Smith, 494 U.S. 872 (1990), the Supreme Court addressed a free 

exercise challenge to a facially neutral and generally applicable

criminal statute. The Court held that the compelling interest

test did not apply to free exercise challenges to "generally

applicable prohibitions of socially harmful conduct." Id. at 

882-85. The Court explained that the First Amendment was not

offended by neutral, generally applicable laws, unless burdening

religion was the object of the law. Id. at 878-82. 

In 1994, Congress enacted the Religious Freedom

Restoration Act ("RFRA"), 42 U.S.C. 2000bb, in response to the

Supreme Court's decision in Smith. RFRA states, in relevant 

part: 

(a) In General -- Government shall not
substantially burden a person's exercise
of religion even if the burden results
from a rule of general applicability,
except as provided in subsection (b) of
this section.

(b) Exception -- Government may
substantially burden a person's exercise
of religion only if it demonstrates that
application of the burden to the person
-- 
(1) is in furtherance of a compelling
governmental interest; and 

(2) is the least restrictive means of
furthering that compelling governmental
interest.

Id. RFRA states that it was enacted to bring the law back to its 

pre-Smith state. Id. 

The plaintiffs' Free Exercise challenge raises two

complex constitutional issues. The threshold issue is whether

-24-

the Free Exercise Clause even applies to public education.11

If indeed the Free Exercise Clause applies to the plaintiffs'

claim, the question would then be whether their free exercise

rights were violated by the compulsory attendance at the Program.

Because the Program was staged in 1992, and RFRA was enacted in

1994, however, a cause of action under RFRA exists only if the

statute applies retroactively. For the reasons stated below, we

conclude that RFRA does not apply retroactively to plaintiffs'

claim for monetary damages.

The Supreme Court has explained that courts should

"decline[] to give retroactive effect to statutes burdening

private rights unless Congress ha[s] made clear its intent."

Landgraf v. USI Film Products, 114 S. Ct. 1483, 1499 (1994). 

Such an intent will not be inferred where the statute "lacks

'clear, strong, and imperative' language requiring retroactive

application." Id. (citing United States v. Heth, 8 U.S. (3 

Cranch) 399, 413 (1806)). "The presumption against statutory

retroactivity has consistently been explained by reference to the

unfairness of imposing new burdens on persons after the fact."

Id. at 1500. 

RFRA states that it "applies to all Federal and State

law, whether statutory or otherwise, and whether adopted before

 

11 At least one federal judge has argued that the Free Exercise
Clause does not restrict the "prerogative of school boards to set
curricula," concluding that school boards' authority in such
matters is bounded only by the Establishment Clause. Mozert v. 
Hawkins County Board of Education, 827 F.2d 1058, 1078-81 (6th 
Cir. 1987) (Boggs, J., concurring).

-25-

or after the enactment of this Act." 42 U.S.C. 2000bb. The

statute was enacted to "restore the compelling interest test" and

provide judicial relief to persons "whose religious exercise has

been burdened in violation of this section." Id. While RFRA 

clearly provides access to declaratory and injunctive relief

against all laws burdening the free exercise of religion, we

think it lacks the "clear, strong, and imperative" language

necessary to create a retroactive cause of action for monetary

damages.

We have found no decisions in which a plaintiff was

awarded damages under RFRA for conduct occurring before the

statute's enactment. Rather, the decisions in which RFRA has

been found retroactive considered only the issue of whether to

grant injunctive relief, as opposed to an award of monetary

damages. See, e.g., Werner v. McCotter, 49 F.3d 1476, 1479-80 

(10th Cir. 1995); Brown-El v. Harris, 26 F.3d 68, 69 (8th Cir. 

1994) (dicta); Boone v. Commissioner of Prisons, No. 93-5074, 

1994 WL 383590, 1994 U.S.Dist. LEXIS 10027 (E.D. Pa. July 21,

1994); Rust v. Clarke, 851 F. Supp. 377, 380 (D. Neb. 1994) 

(dicta); Allah v. Menei, 844 F. Supp. 1056, 1061 at n.15 (E.D. 

Pa. 1994); Lawson v. Dugger, 844 F. Supp. 1538, 1542 (S.D. Fla. 

1994). Equitable relief, however, is prospective rather than

retroactive, even when it applies to conduct occurring before a

statute's enactment. See Landgraf, 114 S. Ct. at 1500. We 

therefore find that the cases purportedly addressing

retroactivity do not support a finding that Congress intended to

-26-

create a retroactive cause of action for monetary damages under

RFRA. Accordingly, the plaintiffs' claim must be addressed under

Smith, the law in effect at the time of the defendants' 

actions.12 

The Supreme Court has explained that a "law that is

neutral and of general applicability need not be justified by a

compelling governmental interest even if the law has the

incidental effect of burdening a particular religious practice."

Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 113 S. 

Ct. 2217, 2226-27 (1993) (citing Smith, 494 U.S. 872). The 

plaintiffs do not allege, nor is it apparent from their claim,

that the compulsory attendance at the Program was anything but a

neutral requirement that applied generally to all students. Cf. 
 

12 Even assuming that RFRA created a retroactive cause of action
for monetary damages, the plaintiffs' free exercise claim would
nevertheless be analyzed under Smith because all the defendants' 
with the possible exception of the School Committee are protected
by qualified immunity from monetary damages.

As we explained above, qualified immunity shields public
officials from pecuniary liability unless they violated
constitutional or statutory norms that were "clearly established"
at the time of the violation. Anderson v. Creighton, 483 U.S. 
635, 639-40 (1987); Harlow, 457 U.S. at 818. 

Because the Program was staged in 1992, the standard set forth
in Smith (rather than the less rigorous RFRA standard) must be 
employed to determine whether the defendants violated a clearly
established right when they compelled the minor plaintiffs'
attendance at the Program. See Werner v. McCotter, 49 F.3d 1476, 
1481-82 (10th Cir.), cert. denied, 115 S. Ct. 2625 (1995) 
(holding that prison officials were shielded from monetary
damages because their acts did not constitute violation of
clearly established rights under the Smith standard and the 
defendants could not be responsible for violations created by the
change in the law); see also Young v. Lane, 922 F.2d 370, 378 
(7th Cir. 1991) (applying qualified immunity to damage claims for
alleged free exercise deprivations).

-27-

Id. (where city ordinance violated Free Exercise clause because 

it targeted the ritual slaughter of animals only by religious

groups).

Rather, plaintiffs allege that their case falls within

the "hybrid" exception recognized by Smith for cases that involve 

"the Free Exercise Clause in conjunction with other

constitutional protections." Smith, 494 U.S. at 881 & n.1. The 

most relevant of the so-called hybrid cases is Wisconsin v. 

Yoder, 406 U.S. 205, 232-33 (1972), in which the Court 

invalidated a compulsory school attendance law as applied to

Amish parents who refused on religious grounds to send their

children to school. In so holding, the Court explained that 

Pierce stands as a charter of the rights 
of parents to direct the religious
upbringing of their children. And, when
combined with a free exercise claim of
the nature revealed by this record, more
than merely a "reasonable relation to
some purpose within the competency of the
State" is required to sustain the
validity of the State's requirement under
the First Amendment.

Id. at 232 (discussing Pierce, 268 U.S. 510). We find that the 

plaintiffs allegations do not bring them within the sweep of

Yoder for two distinct reasons. 

First, as we explained, the plaintiffs' allegations of

interference with family relations and parental prerogatives do

not state a privacy or substantive due process claim. Their free

exercise challenge is thus not conjoined with an independently

protected constitutional protection. Second, their free exercise

claim is qualitatively distinguishable from that alleged in

-28-

Yoder. As the Court in Yoder emphasized:  

the Amish in this case have convincingly
demonstrated the sincerity of their
religious beliefs, the interrelationship
of belief with their mode of life, the
vital role that belief and daily conduct
play in the continued survival of Old
Order Amish communities and their
religious organization, and the hazards
presented by the State's enforcement of a
Statute generally valid as to others.

Id. at 235. Here, the plaintiffs do not allege that the one-time 

compulsory attendance at the Program threatened their entire way

of life. Accordingly, the plaintiffs' free exercise claim for

damages was properly dismissed.

The plaintiffs also seek a declaratory judgment

concerning the alleged infringement of their Free Exercise

Rights. The standing requirement of Article III necessitates

that the claimant "allege personal injury fairly traceable to the

defendant's allegedly unlawful conduct and likely to be addressed

by the requested relief." Allen v. Wright, 468 U.S. 737, 751 

(1984). The Supreme Court has made clear that past exposure to

harm will not in and of itself confer standing upon a litigant to

obtain equitable relief "[a]bsent a sufficient likelihood that he

will again be wronged in a similar way." City of Los Angeles v. 

Lyons, 461 U.S. 95, 104-06, 111 (1983). See also American Postal 

Workers Union v. Frank, 968 F.2d 1373, 1374-76 (1st Cir. 1992). 

Here, the plaintiffs do not allege (nor does it appear) that they

are likely to again be subject to school activities that

allegedly violate their Free Exercise Rights. We accordingly

lack jurisdiction over the claim for declaratory relief and

-29-

conclude that it also was properly dismissed.

IV. Sexual Harassment IV. Sexual Harassment 

The plaintiffs' fifth claim alleges that the defendants

engaged in sexual harassment by creating a sexually hostile

environment, in violation of Title IX of the Education Amendments

of 1972. Title IX provides in relevant part:

No person in the United States shall, on 
the basis of sex, be excluded from 
participation in, be denied the benefits
of, or be subjected to discrimination
under any education program or activity
receiving Federal financial assistance
. . . .

20 U.S.C. 1681. Because the relevant caselaw under Title IX is

relatively sparse, we apply Title VII caselaw by analogy. See 

Franklin v. Gwinnett County Pub. Schs., 112 S. Ct. 1028, 1037 

(1990); Lipsett v. University of Puerto Rico, 864 F.2d 881, 899 

(1st Cir. 1988). 

Title VII, and thus Title IX, "strike at the entire

spectrum of disparate treatment of men and women," including

conduct having the purpose or effect of unreasonably interfering

with an individual's performance or creating an intimidating,

hostile or offensive environment. Meritor Sav. Bank, FSB v. 

Vinson, 477 U.S. 57, 64-65 (1986); Lipsett, 864 F.2d at 899. As 

the Supreme Court explained:

Sexual harassment which creates a hostile
or offensive environment for members of
one sex is every bit the arbitrary
barrier to sexual equality at the
workplace that racial harassment is to
racial equality. Surely, a requirement
that a man or woman run a gauntlet of
sexual abuse in return for the privilege

-30-

of being allowed to work and make a
living can be as demeaning and
disconcerting as the harshest of racial
epithets.

Meritor, 477 U.S. at 67 (quoting Henson v. Dundee, 682 F.2d 897, 

902 (1982)).

The elements a plaintiff must prove to succeed in such

type of sexual harassment claim are: (i) that he/she is a member

of a protected class; (ii) that he/she was subject to unwelcome

sexual harassment; (iii) that the harassment was based upon sex;

(iv) that the harassment was sufficiently severe or pervasive so

as to alter the conditions of plaintiff's education and create an

abusive educational environment; and (v) that some basis for

employer liability has been established. Id. at 66-73. See also 

Harris v. Forklift Sys. Inc., 114 S. Ct. 367 (1993); Lipsett, 864 

F.2d at 898-901.

Title IX is violated "[w]hen the [educational

environment] is permeated with 'discriminatory intimidation,

ridicule, and insult' that is 'sufficiently severe or pervasive

to alter the conditions of the victim's employment and create an

abusive . . . environment.'" Harris, 114 S. Ct. at 370 (quoting 

Meritor, 477 U.S. 64-65 (1986)); Lipsett, 864 F.2d at 898. While 

a court must consider all of the circumstances in determining

whether a plaintiff has established that an environment is

hostile or abusive, it must be particularly concerned with (1)

the frequency of the discriminatory conduct; (2) its severity;

(3) whether it is physically threatening or humiliating rather

than a mere offensive utterance; and (4) whether it unreasonably

-31-

interferes with an employee's work performance. See Harris, 114 

S. Ct. at 371. Although the presence or absence of psychological

harm or an unreasonable effect on work performance are relevant,

no single factor is required. See id.  

The Court has explained that the relevant factors must

be viewed both objectively and subjectively. See id. at 1454. 

If the conduct is not so severe or pervasive that a reasonable

person would find it hostile or abusive, it is beyond Title IX's

purview. See id. Similarly, if the plaintiff does not 

subjectively perceive the environment to be abusive, the conduct

has not actually altered the conditions of her employment, and

there is no Title IX violation. See id. Thus, the court must 

consider not only the actual effect of the harassment on the

plaintiff, but also the effect such conduct would have on a

reasonable person in the plaintiff's position.

Turning to the case at bar, we find that the facts

alleged here are insufficient to state a claim for sexual

harassment under a hostile environment theory. The plaintiffs'

allegations are weak on every one of the Harris factors, and when 

considered in sum, are clearly insufficient to establish the

existence of an objectively hostile or abusive environment.

First, plaintiffs cannot claim that the offensive speech occurred

frequently, as they allege only a one-time exposure to the

comments.13
 

13 We do not hold that a one-time episode is per se incapable of 
sustaining a hostile environment claim. The frequency of the
alleged harassment is a significant factor, but only one of many

-32-

We also think that the plaintiffs' allegations do not

establish that Landolphi's comments were so severe as to create

an objectively hostile environment. This finding is based on

both the context and content of her remarks. The remarks were

given to the entire ninth and tenth grades at what the defendants

labelled an "AIDS awareness program." Significantly, the

plaintiffs do not allege that they were required to participate

in any of the offensive skits or that they were the direct

objects of Landolphi's sexual comments.

Moreover, during his introductory remarks, defendant

Gilchrist advised students that the purpose of the Program was to

educate them about the dangers of sexual activity, stating:

We [] see young people in their twenties
who are infected with the AIDS
virus. . . . It means they caught the
virus when they were in high school, and
will be dead before they are thirty years
old. That's why the doctors are scared,
and they want you to hear the message.

Now, sometimes to hear a message, it
takes a special messenger. And today, we
have a very special messenger, who uses
probably one of the most effective forms
of communication -- humor. I want you to
listen carefully. Enjoy it, but also
remember the message.

Similarly, Landolphi stated in her opening remarks that "[w]e're

going to talk about AIDS, but not in the usual way." These

prefaces framed the Program in such a way that an objective

person would understand that Landolphi's allegedly vulgar sexual
 

to be considered in determining whether the conduct was
"sufficiently severe or pervasive" that a reasonable person would
find that it had rendered the environment hostile or abusive.

-33-

commentary was intended to educate the students about the AIDS

virus rather than to create a sexually hostile environment.

These introductions also belie the plaintiffs' claim

that Landolphi's speech was physically threatening and

humiliating, rather than a mere offensive utterance.

Landolphi's remarks were not directed specifically at the

plaintiffs and were couched in an attempt to use humor to educate

the students on sex and the AIDS virus. In this context, while

average high school students might have been offended by the

graphic sexual discussions alleged here, Landolphi's remarks

could not reasonably be considered physically threatening or

humiliating so as to create a hostile environment.

Similarly, the plaintiffs' allegations establish that

the Program did not significantly alter their educational

environment from an objective standpoint. The Program consisted

of two ninety-minute sex-education presentations, and although

the plaintiffs allege that "coarse jesting, sexual innuendo, and

overtly sexual behavior took place for the weeks following the

Program," they fail to explain how the coarse jesting and overtly

sexual behavior "create[d] an atmosphere so infused with

hostility toward members of one sex that [it] alter[ed] the

[educational environment] for them." Lipsett, 864 F.2d at 897. 

In fact, they allege that the offensive behavior was visited on

"those students," regardless of gender, "who were not inclined to

accept 'the message' about human sexuality." If anything, then,

they allege discrimination based upon the basis of viewpoint,

-34-

rather than on the basis of gender, as required by Title IX. We

therefore find that their claim under Title IX fails.

CONCLUSION CONCLUSION

We have considered the other claims of the plaintiffs

and find them similarly without merit.

Affirmed. Affirmed 

-35-